**KHALED ABDULLAH and KHITHAM ABDULLAH, Plaintiffs**
**v.**
**AMERICAN AIRLINES, INC., Defendant**

Civ. No. 91-0277F

**AUDREY JAMES, EARDLEY JAMES, VELMA GEORGE, and KOTNIE GEORGE, Plaintiffs**
**v.**
**AMERICAN AIRLINES, INC., Defendant**

Civ. No. 93-0108F

District Court of the Virgin Islands

Div. of St. Croix

June 5, 1997

141

142

Lee J. Rohn, Esq., Christiansted, U.S.V.I., *for Plaintiffs Abdullahs*

Gordon C. Rhea, Esq., Christiansted, U.S.V.I., *for Plaintiffs Georges*

Eric Moore, Esq., Christiansted, U.S.V.I., and Jeffrey Ellis, Esq., New York, N.Y., *for Defendant*

FINCH, *Judge*

## OPINION

This matter comes before the Court on Defendant American Airlines, Inc.'s ("American") motion for judgment as a matter of law, or in the alternative a new trial with costs, attorney fees and transfer of the case to the Southern District of New York and on the

Plaintiffs' motion to reconsider the exclusion of certain expert testimony.

## BACKGROUND

Plaintiffs Khaled Abdullah, Khitam Abdullah, Audrey James, Eardley James, Velma George, and Kotnie Georgie were passengers aboard American Airlines Flight 1473 on August 28, 1991. Enroute between New York and San Juan, Puerto Rico the aircraft encountered turbulence causing injuries to the Plaintiffs. At trial, the jury awarded damages to four of the six Plaintiffs aggregating to more than two million dollars.

As one of its grounds for a new trial American asserted that prejudicial evidence concerning the standards of care for pilots, flight attendants, and passengers other than the standards of care established by federal regulations should not have been admitted because the federal standards preempt any state or territorial standards of care.[1] American also requests that in the event of a new trial, the case be transferred to the Southern District of New York. The Plaintiffs asks the Court to admit the expert testimony of Mr. Paul Bray if a new trial is ordered.

Because the Court holds that the standards of care for pilots, flight attendants and passengers are federally preempted, that the evidence at trial was not limited to the federally established standards of care, and that the admission of such evidence was prejudicial, a new trial must be held. So that evidentiary questions such as the admission or exclusion of certain expert testimony can be considered as they are raised in the context of the new trial, the Court denies the Plaintiffs' motion to admit certain expert testimony without prejudice. Finally the Court requests supplementary

---

[1] American also argues that the evidence was insufficient (1) to establish the standards of care for pilots and flight attendants and to show that such standards would result in higher safety; (2) to show that the warnings to passengers were inadequate, that flight attendants had not performed a compliance check, and that the pilots' radar training was inadequate; (3) to show that an inadequate warning, lack of compliance check, or piloting error proximately caused Plaintiffs' injuries; (4) to justify the full jury awards in light of the proven damages. American further claims that the testimony of plaintiffs' witness Dr. Robert Cunitz was erroneously admitted and that surveillance videotapes, certain statements and certain documents were erroneously excluded. Finally American contends that a new trial is warranted with attorney fees and costs because improprieties of the Plaintiffs' counsel unduly influenced the jury.

briefs and oral arguments on American's motion to transfer venue before deciding that motion.

## FEDERAL PREEMPTION ANALYSIS

### Federal Preemption Background

American claims that federal law preempts state and territorial law with respect to establishing the standards of care required by pilots, flight attendants, and passengers during the course of an airline flight. If the federally established standards of care are violated, according to American, state or territorial law can be applied to provide a damage remedy. The Plaintiffs argue that federal law does not preempt state and territorial law with respect to either establishing the standards of care or awarding damages.

■ This disagreement first came before the Court via a motion in limine.[2] After review of relevant decisions, the Court held that the field of aviation safety is not federally preempted. *Abdullah v. American Airlines*, No. 91-0277F, (D.C.V.I. filed July 14, 1995). The Defendant in its Motion for a New Trial in effect asks the Court to revisit its prior decision concerning federal preemption. Upon reconsideration, the Court holds that the standards of care required by pilots, flight attendants, and passengers during the course of an airline flight are federally preempted, but that damages may be awarded under state or territorial law for violation of the federally established standards of care.

The Court arrives at its conclusion in two parts: First the Court finds that the field of aviation safety is federally preempted

---

[2] The Plaintiffs claim that American did not properly preserve this issue for review. The Plaintiffs' argument is without merit for two reasons: First, a motion for a new trial may be granted even when a party does not raise the issue at the close of the evidence or renew the motion after the verdict is returned. 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2539, at 362 (2d ed. 1995). Second, American did raise the preemption issue both at the close of the Plaintiffs' evidence and before closing arguments. Defense counsel stated at the close of the Plaintiffs' case:

[J]ust to preserve our record, . . . we do contend that [the standard of care for pilots] would be an issue that would be preempted, and under the preemptions status, which your Honor has ruled on, I think you're very familiar, but we of course renew what we said in that regard.

Defense counsel, in his motion to renew its previous RULE 50 motion, stated at the close of the evidence: "Your Honor, rather than waste the court's time, we discussed it in chambers, we would renew our RULE 50 Motion on all the prior fronts that we previously made."

according to the federal preemption tests prescribed by the Supreme Court. Second, the Court determines that despite federal preemption of the standards of care in aviation safety, state or territorial remedies are not federally preempted.

## Discussion

### I. Federal Preemption of Aviation Safety

#### A. Preemption Generally

■ Under the Supremacy Clause of Article VI of the Constitution,[3] Congress has the power to preempt state law. *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (1986). Whether federal law preempts state law depends on congressional intent. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299 (1988). Such intention may be express or implied. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). State common law rules may be preempted in the same ways as state statutes or regulations. *Public Health Trust v. Lake Aircraft, Inc.*, 992 F.2d 291 (11th Cir. 1993) (*citing Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 523 (1992)).

■ An early Supreme Court test for determining whether Congress impliedly intended preemption, set forth in *Cooley v. Board of Wardens*, was whether the nature of the matter lent itself to exclusive federal regulation: "Whatever subjects of this [commerce] power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." 12 How. 299, 319 (1851).[4] More precise and elaborate tests have emerged in recent years: Implied federal preemption is now found

---

[3] The Supremacy Clause of the Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Article VI, cl. 2.

[4] Modern preemption tests incorporate the nature of the subject matter concept by considering whether the federal interest dominates: "[An] Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

when "state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress," *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984), when there is pervasive federal regulation in the field, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), or when state law conflicts with federal law, *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983).

The scope of federal preemption may be narrowly defined. For example, the Third Circuit recently held that federal regulation of nuclear safety preempted state tort law on the standard of care in *In re TMI Litigation Cases Consolidated II*, 940 F.2d 832, 859 (3d Cir. 1991) [hereinafter *TMI II*], *cert. denied*, 503 U.S. 906 (1992) and *In re TMI*, 67 F.3d 1103, 1106-7 (3d Cir. 1995),[5] but considered whether causation and damages were federally preempted to be a separate question. *In re TMI*, 67 F.3d at 1107; *see also Bieneman v. City of Chicago*, 864 F.2d 463, 471 (7th Cir. 1988) (noting that "[s]tate courts award damages every day in air crash cases, notwithstanding that federal law preempts the regulation of safety in air travel.").

## B. Preemption of the Aviation Safety Standard of Care

Through application of the preemption considerations expounded by the Supreme Court, the Court finds that Congress intended to preempt state and territorial regulation of aviation safety. Although Congress did not expressly preempt this field,[6] such intention is inferred from the legislative history and the pervasive nature of the federal regulation of aviation safety. Moreover, the nature of aviation safety is such that it admits of only one uniform system of regulation.

---

[5] These two related opinions were influenced by two decisions of the highest court: *Pacific Gas & Electric Co.*, 461 U.S. at 212-13, and *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984). In *Pacific Gas & Electric Co.* the Court held that state regulation of nuclear safety was impliedly preempted by Congress and that any state standard of care would infringe on federal objectives. 461 U.S. at 212-13. In *Silkwood* the Court held that although the standard of care was federally preempted, state remedies were still available. 464 U.S. at 256.

[6] *See, e.g., Smith v. America West Airlines, Inc.*, 44 F.3d 344, 346-47 (5th Cir. 1995); *Trinidad v. American Airlines, Inc.*, 932 F. Supp. 521, 526 (S.D.N.Y. 1996); *Dudley v. Business Express, Inc.*, 882 F. Supp. 199, 206-7 (D.N.H. 1994); *Fenn v. American Airlines, Inc.*, 839 F. Supp. 1218, 1222 (S.D. Miss. 1993); *Harrell v. Champlain Enter., Inc.*, 613 N.Y.S. 2d 1002, 1004 (N.Y. App. Div. 1994).

1. Congressional objective

Congress' purpose in enacting the Federal Aviation Act of 1958 ("FAA"), Pub. L. No. 85-726, 72 Stat. 731, (codified as amended at 49 U.S.C. §§ 40101-49105) was "to promote safety in aviation and thereby protect the lives of persons who travel on board aircraft." *In re Mexico City Aircrash of October 13, 1979*, 708 F.2d 400, 406 (9th Cir. 1983); *accord Rauch v. United Instruments, Inc.*, 548 F.2d 452, 457 (3d Cir. 1976). The FAA was enacted in response to a series of "fatal air crashes between civil and military aircraft *operating under separate flight rules*." *United States v. Christensen*, 419 F.2d 1401, 1404 (9th Cir. 1969) (alteration in original) (*quoting* 1958 U.S.C.C.A.N. 3742).

According to the legislative history, Congress considered a single uniform system of regulation to be essential to increasing air safety. *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 639 (1973) (noting that "a uniform and exclusive system of federal regulation" is required "if the congressional objectives underlying the [FAA] are to be fulfilled"); *Christensen*, 419 F.2d at 1404 (remarking that "the whole tenor of the [FAA] and its principal purpose is to create and enforce one unified system of flight rules"). The House Report accompanying the FAA, indicates that one of its purposes is to give "[t]he Administrator of the new Federal Aviation Agency . . . full responsibility and authority for the advancement and promulgation of civil aeronautics generally, including promulgation and enforcement of safety regulations."[7] H.R. Rep. No. 2360, *reprinted in* 1958 U.S.C.C.A.N. 3741, 3741. In addition, in a letter included as part of the House Report, the Airways Modernization Board Chairman wrote:

> It is essential that one agency of government, and one agency alone, be responsible for issuing safety regulations if we are to have timely and effective guidelines for safety in aviation.

---

[7] Originally called the Federal Aviation Agency, it was later renamed the Federal Aviation Administration and made part of the Department of Transportation. Department of Transportation Act, Pub. L. No. 89-670, §§ 3(e)(1), 6(c)(1), 80 Stat. 931, 932, 938 (1966) (codified as amended in scattered section of 49 U.S.C.)

*Id.* at 3761. Just after the passage of the FAA, the Second Circuit remarked: "The Federal Aviation Act was passed by Congress for the purpose of centralizing in a single authority— indeed, in one administrator— the power to frame rules for the safe and efficient use of the nation's airspace." *Airline Pilots Ass'n, Int'l v. Quesada,* 276 F.2d 892, 894 (2d Cir. 1960).

Although such comments may have been intended only to support the consolidation of aviation safety regulation which previously had been divided among federal agencies into a single agency, they have been interpreted to mean that Congress did not intend that aviation safety regulatory authority be shared by the states and territories. *See, e.g., French v. Pan Am Express, Inc.,* 869 F.2d 1, 5 (1st Cir. 1989). In the seminal case of *City of Burbank v. Lockheed Air Terminal, Inc.,* the Supreme Court held that Congress' consolidation of control of aviation in one agency indicated Congress' intent to federally preempt aviation safety. 411 U.S. at 639. Justice Rhenquist, although dissenting in *City of Burbank,* agreed with the majority on the issue of federal preemption: He noted that "Congress clearly intended to pre-empt the States from regulating aircraft in flight." 411 U.S. at 644. According to Justice Rhenquist:

> The 1958 Act was intended to consolidate in one agency in the Executive Branch the control over aviation that had previously been diffused within that branch. The paramount substantive concerns of Congress were to *regulate federally all aspects of air safety,* . . . and, once aircraft were in "flight," air-space management . . . .

*Id.* (emphasis added)

In *Cleveland v. Piper Aircraft Corp.* the Tenth Circuit concluded that the holding in *City of Burbank* was limited to federal preemption of aircraft noise. 985 F.2d 1438, 1442 n.7 (10th Cir. 1993). However, the Supreme Court has neither overruled nor limited or distinguished its holding in *City of Burbank.* Moreover, the Tenth Circuit's interpretation is contrary to the holding in *City of Burbank:* In *City of Burbank,* the Court first noted that the Solicitor General had conceded that airspace management was federally preempted. 411 U.S. at 627. Finding this to be a "fatal concession," the Court

then held that state noise regulation was federally preempted because of its interrelationship with airspace management. *Id*. at 627-28. Furthermore, recognizing the broad scope of federal preemption, the Second Circuit in *British Airways Bd. v. Port Authority of New York* held that by enacting the 1968 noise control amendments to the FAA, Congress "merely intended to strengthen the FAA's regulatory role within the area already totally preempted—control of flights through navigable airspace." 558 F.2d 75, 84 (2d Cir. 1977); *accord City of Burbank*, 411 U.S. at 635.

In contrast to the Tenth Circuit, other circuit courts have found implied federal preemption of various aspects of aviation in light of Congress' objective in enacting the FAA. For example, in *French v. Pan Am Express, Inc.* the First Circuit, in finding pilot regulation related to air safety to be federally preempted, determined that Congress had enacted the FAA with the "legislative goal of establishing a single, uniform system of control over air safety." 869 F.2d at 6-7. The Seventh Circuit in *Kohr v. Allegheny Airlines, Inc.*, in finding the rights and liabilities of parties to litigation ensuing from a mid-air collision to be federally preempted, considered its preemption conclusion to be compelled by Congress' objective: "[T]he principal purpose of the [FAA] is to create one unified system of flight rules and to centralize in the Administrator of the Federal Aviation Administration the power to promulgate rules for the safe and efficient use of the country's airspace." 504 F.2d 400, 404 (7th Cir. 1974). The court in *Kohr* perceived a "predominant, indeed almost exclusive, interest of the federal government in regulating the affairs of the nation's airways." *Kohr*, 504 F.2d at 403. According to a concurring opinion from the Sixth Circuit, "Congress excepted only limited areas from federal control when it enacted the FAA." *Gustafson v. City of Lake Angelus*, 76 F.3d 778, 792 (6th Cir. 1996) (Jones, J. concurring) (agreeing with the majority that local land and water use are not preempted, but that aviation safety, navigable airspace and noise control are preempted).

Although the Third Circuit has not yet considered whether aviation safety is federally preempted in accordance with Congress' objective, it has examined the analogous preemption question in the context of nuclear energy. The Third Circuit held in *TMI*

150

*II*: "Permitting the state to apply their own nuclear regulatory standards, in the form of the duty owed by nuclear defendants in tort, would, . . . 'frustrate the objectives of the federal law.'" 940 F.2d at 859(citation omitted); *see also San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244 (1959)(holding in the field of labor relations that "to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.") This same rationale applied to nuclear energy regulation is germane to aviation safety: Because the legislative history indicates that Congress' objective was to federally regulate aviation safety, any state or territorial established standards of care relating to aviation safety are federally preempted.

2. Pervasive regulation

Congressional intent to preempt may be inferred when a field is heavily federally regulated. *French*, 869 F.2d at 4 (noting that "[t]he regulations promulgated . . . under the [FAA] bulwark our finding that Congress intended to occupy the field of pilot regulation related to air safety"). For example, in *French*, the court stated:

> In this case, the regulations, read in conjunction with the [FAA] itself, likewise evince the presence of an imbricated federal scheme for monitoring pilot fitness in the interest of air safety and dovetail neatly with what we believe to be Congress' intent to preempt state law in this area.

*Id.*

In enacting the FAA, Congress rested the responsibility for supervising the aviation industry with the federal government:

> [A]viation is unique among transportation industries in its relation to the federal government—it is the only one whose operations are conducted almost wholly within federal jurisdiction, and are subject to little or no regulation by States or local authorities. Thus, the federal government bears virtually complete responsibility for the promotion and supervision of this industry in the public interest.

S. Rep. No. 1811, 85th Cong., 2d Sess. 5 (1958).

■ To enable the federal government to "ensure the safety of aircraft," 49 U.S.C. § 40103(b)(1), Congress gave the Administrator of the Federal Aviation Administration ["Administrator"] "broad authority" with respect to air safety standards:[8] *City of Burbank*, 411 U.S. 627. The Ninth Circuit referred to the obligation of the Administrator "to give full consideration to the duty resting upon air carriers to perform their services with the highest degree of safety in the public interest," in finding the area of aviation to be federally preempted. *World Airways, Inc. v. International Bhd. of Teamsters*, 578 F.2d 800, 803 (9th Cir. 1978). Similarly the court in *French* found federal preemption of state law regarding pilot qualifications because the Administrator was already charged with regulating this area:

> The intricate web of statutory provisions affords no room for the imposition of state law criteria vis-a-vis pilot suitability. We therefore conclude, without serious question, that preemption is implied by the comprehensive legal scheme which imposes on the [Administrator] the duty of qualifying pilots for air service.

*French*, 869 F.2d at 4. The Third Circuit has also recognized the broad authority Congress placed in the Administrator:

> The paramount concern of Congress for safety in air travel is evident in . . . sections of the [FAA] spelling out the powers and duties of the Administrator. *See*

---

[8] The broad scope of the Administrator's authority is indicated by 49 U.S.C. § 44701(c) which provides: "The Administrator shall carry out this chapter in a way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation." More specifically, sections 307(a) and (c) of the Act provide in relevant part:

(a) The Administrator is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace . . . .

. . .

(c) The Administrator is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the utilization of the navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

§§ 302(c)(1), 307, 312(c), 602(b), 603, 604, 605(b), and 609(a) of the [FAA]. . . . Other parts of the [FAA] pertaining to the functions of the Civil Aeronautics Board, the Secretary of Transportation, the National Transportation Board and the Chief of the Weather Bureau also contain indications of congressional concern for the safety of aircraft in flight. *See* §§ 102(b) and (e), 103(a) and (c), 701(a)(5) and 803 of the [FAA] . . . . Undoubtedly, the congressional objective of safety permeates the [FAA] and the fostering of safe air travel was the primary motive of Congress for the enactment of § 601 of the [FAA] and the Administrator's chief concerns in promulgating, under the authority of that section, the safety provisions of the Federal Aviation Regulations upon which the plaintiffs rely.

*Rauch*, 548 F.2d at 457.

The Administrator has exercised this authority by implementing a comprehensive system of rules and regulations for the purpose of promoting flight safety, including regulation of pilot certification,[9] pilot pre-flight duties,[10] pilot flight responsibilities,[11] and flight

---

[9] For example, 14 C.F.R. § 61.3 (1996) provides:

> No person may act as pilot in command, or in any other capacity as a required pilot flight crew member of a civil aircraft of United States registry unless he has in his personal possession a current pilot certificate issued to him under this part.

The court in *Northwest Airlines, Inc. v. Gomez-Bethke* held that "the comprehensive nature of the federal regulatory scheme governing the issuance of airman certificates clearly indicates an intent on the part of Congress to occupy the field of pilot regulation." 34 Emp. Prac. Dec. (CCH) at 34,501.

[10] For example, before flight the pilot must review available information concerning the flight, 41 C.F.R. § 91.103 (1996), verify the aircraft's worthiness, 14 C.F.R. § 91.5 (1996), and ensure that passengers are briefed on the use of their seatbelts, 14 C.F.R. § 91.107 (1996).

[11] For example, according to 14 C.F.R. § 91.13, "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.13 (1996). Furthermore 14 C.F.R. § 91.5 mandates that "[t]he pilot in command shall discontinue the flight when unairworthy mechanical, electrical, or structural conditions occur."

rules,[12] such that "the expansiveness of the regulatory net is readily apparent." *French* 869 F.2d at 4, n.4. Such pervasive regulation has led courts to find federal preemption in aviation, *Northwest Airlines Inc. v. Gomez-Bethke*, 34 Emp. Prac. Dec. (CCH) ¶ 34,561 (D. Minn. 1984)[1984 WL 1040], with respect to the safety-related questions of pilot qualifications, *e.g.*, *French*, 869 F.2d at 7; *World Airways, Inc.*, 578 F.2d at 803; *Northwest Airlines Inc.*, 34 Emp. Prac. Dec. (CCH) ¶ 34,561, airspace management, flight operations, and aviation noise, *e.g.*, *City of Burbank*, 411 U.S. at 633; *Price v. Charter Township*, 909 F. Supp. 498 (E.D. Mich. 1995); *San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1306, 1316 (9th Cir. 1981); *see id.* at 1351 n.22 (citing numerous cases in which the courts held flight control regulation to reduce noise federally preempted); *see also Gustafson*, 76 F.3d at 786 (stating in dicta that "[federal]] regulations preempt local law in regard to aircraft safety, the navigable airspace, and noise control").[13]

Federal regulation is just as pervasive in aviation safety as it is in these areas in which courts have found federal preemption. *Northwest Airlines Inc.*, 34 Emp. Prac. Dec. (CCH) ¶ 34,561 (emphasizing that "[n]owhere is the pervasiveness of the federal regulatory scheme more apparent than in the area of air safety"). Because the field of aviation safety is pervasively regulated, indicating Congress' intent to occupy this field, the Court finds the standards of care for pilots, flight attendants, and passengers to be federally preempted.

3. The nature of aviation

Recent Supreme Court decisions concerning implied federal preemption turn on whether state regulation would obstruct Congress' objectives, whether the field is pervasively federally regulated, and whether federal and state regulations conflict. Nonetheless, the nature of the subject matter, considered by the

---

[12]14 C.F.R. § 91.101 states: "This subpart prescribes flight rules governing the operation of aircraft within the United States and within 12 nautical miles from the coast of the United States."

[13]In *Cleveland* the Tenth Circuit distinguished the *French* and *Northwest Airlines, Inc.* decisions "because they do not involve tort claims that implicate the savings clause. . . which shows contrary congressional intent." 985 F.2d at 1442 n.7.

Supreme Court in its 1851 *Cooley* decision to be indicative as to whether Congress impliedly intended federal preemption, remains a relevant consideration.

Federal aviation by nature admits to only one uniform system of safety standards. *Northwest Airlines, Inc v. Minnesota*, 322 U.S. 292, 303 (1943). Justice Jackson, in his concurrence in *Northwest Airlines, Inc. v. Minnesota*, remarked:

> Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hand of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state governments.

322 U.S. 292, 303 (1943) (*cited in City of Burbank*, 411 U.S. at 638). Five years after *Northwest Airlines, Inc. v. Minnesota*in *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, the Supreme Court referred again to the nature of aviation: "A way of travel which quickly escapes the bounds of local regulative competence called for a more penetrating, uniform and exclusive regulation by the nation than had been thought appropriate for the more easily controlled commerce of the past." 333 U.S. 103, 107 (1948).

Because of the nature of aviation, allowing the states to regulate air safety would create a "crazyquilt effect:" *French*, 869 F.2d at 6. Without federal preemption, "[t]he likelihood of multiple, inconsistent rules would be a dagger pointed at the heart of commerce—and the rule applied might come literally to depend on which way the wind was blowing." *British Airways Bd.*, 558 F.2d at 83 (referring specifically to aircraft noise control).

At least three circuit courts have considered the nature of aviation as relevant to the question of federal preemption. The First Circuit in *French* examined the nature of aviation: "The regulation

155

of interstate flight—and flyers—must of necessity be monolithic. Its very nature permits no other conclusion." 869 F.2d at 6. The Ninth Circuit interpreted the *City of Burbank* decision as "not rest[ing] solely on pervasive regulation." The court observed: "Indeed, the national character of the subject matter was said to be the 'critical issue.'" *San Diego Unified Port Dist.*, 651 F.2d at 1312 n.11 (*quoting City of Burbank*, 411 U.S. at 625). Judge Jones of the Sixth Circuit in a concurring opinion recently emphasized the national nature of aviation stating:

> As history has taught use, certain areas of regulation in our country must be left to the control of the national government. The very nature of some subjects implicate federal control. Air traffic must be regulated at the national level. Without uniform equipment specifications, takeoff and landing rules, and *safety standards*, it would be impossible to operate a national air transportation system.

*Gustafson*, 76 F.3d at 792 (Jones, J. concurring) (emphasis added).

The Third Circuit has not yet considered whether the nature of aviation is such that aviation safety must be federally preempted. However, it has observed that "where application of state law would impair the federal policy, or where there is a 'distinct need for nationwide legal standards,' federal standards must be developed." *Reo v. United States Postal Service*, 98 F.3d 73, 76 (3d Cir. 1996) (citation omitted).

Thus, in accordance with this early test for federal preemption, its application by various courts to the aviation context, and the Third Circuit's recognition of the need for nationwide legal standards in certain circumstances, the Court finds that the nature of aviation compels federal preemption of the standards of care for pilots, flight attendants, and passengers.

## C. Response to Anti-Preemption Arguments

Many courts have held that the field of aviation safety is not federally preempted. The rationales on which the courts rely in finding no federal preemption are fairly uniform. Courts note that personal injuries are not covered by an express preemption clause

of the Airline Deregulation Act of 1978 ("ADA"), Pub. L. No. 95-504, 92 Stat. 1705, which preempts state regulation of "rates, routes, and services." They reason that because the ADA includes an express preemption clause impliedly all other aspects of airline regulation are not preempted. They see no conflict between state and federal law, noting that Congress intended the federal regulations to be only minimum standards leaving the field open for the states and territories to impose higher standards. They conclude that the savings clause of the FAA, carried over in the ADA, expressly preserves state common law actions. They find that the savings clause coupled with an insurance requirement indicate that Congress had the intent of covering personal injuries. They note that if there were preemption, the result would be grossly unfair to injured passengers, and could not have been what Congress intended. Finally the courts assert that states have historically had the power to regulate safety.

These rationales against federal preemption of aviation safety are refuted below:

### 1. *Expressio unius est exclusio alterius*

Courts observe that the regulation of "rates, routes, and services" is expressly preempted by Section 105(a)(1) of the ADA[14] and that claims for personal injuries are not covered by this preemption clause. *See, e.g., Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995); *Trinidad v. American Airlines, Inc.*, 932 F. Supp. 521, 525-26 (S.D.N.Y. 1996); *Moore v. Northwest Airlines, Inc.*, 897 F. Supp. 313, 314-15 (E.D. Tex. 1995); *Jamerson v. Atlantic Southeast Airlines*, 860 F. Supp. 821, 826 (M.D. Ala. 1994); *Margolis v. United Airlines, Inc.*,811 F. Supp. 318, 322 (E.D. Mich. 1993) (collecting cases); *O'Hern v. Delta Airlines, Inc.*, 838 F. Supp. 1264, 1267 (N.D. Ill. 1993); *Stewart v. American Airlines, Inc.*, 776 F. Supp. 1194, 1199 (S.D. Tex. 1991); *Romano v. American Trans Air*, 56 Cal. Rptr. 2d 428, 432 (Cal. Ct.

---

[14] Section 105(a)(1) of the ADA provides:

> [N]o State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier . . . .

49 U.S.C. § 41713(b)(1).

App. 1996) (collecting cases); *Harrell v. Champlain Enter. Inc.*, 613 N.Y.S.2d 1002, 1004 (N.Y. App. Div. 1994) (collecting cases); *see also American Airlines, Inc. v. Wolens*, 513 U.S. 219, _____ n.7, 115 S.Ct. 817, 825 n.7 (1995) (noting that the United States as Amicus Curiae had conceded that "[i]t is . . . unlikely that [the ADA] preempts safety-related personal injury claims relating to airplane operations"). They then conclude that the standards of care related to aviation safety by implication must not be preempted because *expressio unius est exclusio alterius. See, e.g., Public Health Trust*, 992 F.2d at 291; *Cleveland*, 985 F.2d at 1443-44; *Trinidad*, 932 F. Supp. at 526; *O'Hern*, 838 F. Supp. at 1266-67. The Court agrees with American that reliance on this maxim to determine whether the standards of care are federally preempted is inappropriate.

According to the *expressio unius est exclusio alterius* maxim of statutory interpretation, "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Public Health Trust*, 992 F.2d at 294 (*quoting Cipollone*, 502 U.S. at 517). However, the maxim should be employed with caution and in only limited circumstances, because "it stands on the faulty premise that all possible alternatives or supplemental provisions were necessarily considered and rejected by the legislative draftsmen."[15] *National Petroleum Refiners Ass'n v. F.T.C.*, 482 F.2d 672, 676 (D. D.C. 1973); *accord Potomac Passengers Ass'n v. Chesapeake & Ohio Ry. Co.*, 475 F.2d 325, 331-32 (D. D.C. 1973) (noting that although the maxim has "superficial appeal," courts often caution against its application).

---

[15] In *United States v. Castro*, 837 F.2d 441 (11th Cir. 1988), the court emphasized the limitations of the maxim quoting the following excerpt:

> Several Latin maxims masquerade as rules of interpretation while doing nothing more than describing results reached by other means. The best example is probably *expressio unius est exclusio alterius*, which is a rather elaborate, mysterious sounding, and anachronistic way of describing the negative implication. Far from being a rule, it is not even lexicographically accurate, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds. Sometimes it does and sometimes it does not, and whether it does or does not depends on the particular circumstances of context. Without contextual support, therefore, there is not even a mild presumption here. Accordingly, this maxim is at best a description, after the fact, of what the court has discovered from context.

837 F.2d 441, 443 n.2 (11th Cir. 1988) (*quoting* R. Dickerson, The Interpretation and Application of Statutes 234-35 (1975)).

■ The maxim is merely a rule of statutory construction, an aid to interpretation, not a rule of substantive law. *Neuberger v. Commissioner of Internal Revenue*, 311 U.S. 83, 88 (1940). Professor Singer warns: "It must be remembered that in the usual circumstances the application of the maxim is subordinated to the basic rule of statutory construction that the intent of the statute prevails over the letter." Sutherland Stat. Const. § 47.25 (5th Ed. 1992). Because the maxim "serves only as an aid in discovering the legislative intent when that is not otherwise manifest," *United States v. Barnes*, 222 U.S. 513, 519 (1912), "[i]t can never override clear and contrary evidences of Congressional intent." *Neuberger*, 311 U.S. at 88; *see United States v. Castro*, 837 F.2d 441, 443 (11th Cir. 1988) (holding that the maxim "cannot apply when the legislative history and context are contrary to such a reading of the statute"); *National Ass'n of Metal Finishers v. EPA*, 719 F.2d 624, 648 n.33 (3d Cir. 1983) (considering the maxim inapplicable because of "persuasive evidence of a contrary legislative intent").

According to the Supreme Court, "the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body." *Church of the Holy Trinity v. United States*, 143 U.S. 457, 463 (1892). Thus, whether the maxim should be applied to the standards of care for pilots, flight attendants, and passengers depends on Congress' intent when it enacted the ADA.

The legislative history of the ADA indicates that it was enacted for a particular purpose, "[t]o ensure that the States would not undo federal deregulation with regulation of their own . . . [by] prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier." *Morales v. Trans World Airlines, Inc.*, 504 U.S 374, 378-79 (1992). Congress enacted the ADA to prevent states from hampering competition. *Smith v. America West Airlines, Inc.*, 44 F.3d 344, 346 (5th Cir. 1995). Because safety is not an area upon which the airlines are likely to compete, Congress did not intend the ADA to have any effect on aviation safety. *See id.; Trinidad*, 932 F. Supp. at 527. According to the court in *Margolis v. United Airlines, Inc.*, "[p]reemption under [the ADA] was not intended to be an insurance policy for air carriers against their own negligence." 811 F. Supp. 318, 324 (E.D. Mich. 1993).

In drafting the ADA, Congress did not review the entire existing statutory body of aviation law to determine which statutory sections to expressly preempt: "Neither the ADA nor its legislative history indicates that Congress intended to displace the application of state tort law to personal physical injury inflicted by aircraft operations, or that Congress even ever considered such preemption."[16] *Hodges*, 44 F.3d at 338. Thus, the basic premise of the *expressio unius* maxim is unsatisfied.

Another fact weighing heavily against application of the maxim is that the ADA was enacted more than twenty years after the FAA. As the court noted in *Moreno Rios v. United States*, "the maxim . . . is pretty weak when applied to acts of Congress enacted at widely separated times." 256 F.2d 68, 71 (1st Cir. 1958); *see also Cipollone*, 505 U.S. at 520 (remarking that "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'"(citation omitted)).

The First Circuit emphatically rejected using the *expressio unius* maxim to find no preemption in aviation except as delineated under the ADA:

> Yet the siren song is hopelessly off-key . . . [T]he [express preemption clause] affords no basis for concluding that

---

[16] Although the topic of aviation safety is not addressed in the legislative history of the ADA, Congress did consider the scope of aviation federal preemption when it enacted aviation noise legislation in 1968. Act of July 21, 1968, Pub. L. 90-411, 82 Stat. 395. According to the Supreme Court, Congress concurred with the Secretary of Transportation's opinion that the courts had already recognized the federal preemption of the regulation of aircraft flight:

> The courts have held that the federal government presently preempts the field of noise regulation insofar as it involves controlling the flight of aircraft . . . . H.R. 3400 would merely expand the federal government's role in a field already preempted. It would not change this preemption. State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft.

*City of Burbank*, 411 U.S. at 635 (quoting S. Rep. No. 1353, 90th Cong., 2d Sess., 6).

Thus, even if Congress in enacting the ADA had considered whether to expressly indicate the preemptive effect of other aviation statutory sections, because historically Congress has considered flight control to be judicially recognized as preempted, it may not have seen any purpose in expressly preempting flight safety. *See Bland v. Commissioner of Internal Revenue*, 102 F.2d 157, 159 (7th Cir. 1939) (holding that by enlarging rather than reducing the number of judges subject to income tax, Congress never intended to exempt those already plainly within the provisions of the existing law).

Congress meant to leave states free to regulate on all other issues anent air safety and pilot fitness.

*French,* 869 F.2d at 3. This Court agrees with the First Circuit. Although Congress has expressly preempted certain areas of aviation regulation, Congress did not intend by enacting such express preemption provisions that the area of aviation safety become vulnerable to state and territorial regulation.

### 2. No federal-state law conflict

Congress directed the Administrator to prescribe "minimum standards" to promote safety. 49 U.S.C. § 44701.[17] Courts have determined that because federal administrative authority is limited to setting and enforcing minimum standards, a common law duty may be owed beyond the FAA regulations. *See, e.g., In re Air Disaster at Lockerbie, Scotland,* 37 F.3d 804, 815 (2d Cir. 1994); *Cleveland,* 985 F.2d at 1444-45; *Sunbird Air Services, Inc. v. Beech Aircraft Corp.,* 789 F. Supp. 360, 362-63 (D. Kan. 1992); *Holliday v. Bell Helicopters Textron, Inc.,* 747 F. Supp. 1396, 1401 (D. Haw. 1990). For example, the court in *Sunbird Air Services, Inc. v. Beech Aircraft Corp.* concluded: "The regulations promulgated by the FAA are merely minimum safety standards and do not preclude a finding of negligence where a reasonable person would take additional precautions." 789 F. Supp. at 362-63. Because the shared goal of both the state and federal governments is air safety, some courts considers that any state action would serve to raise the level of air safety and thus would supplement the federal regulations. *See, e.g., Cleveland,* 985 F.2d at 1443, 1445; *Dudley v. Business Express, Inc.,* 882 F. Supp. 199, 207 ( D.N.H. 1994); *Holliday,* 747 F. Supp. at 1401.

Before permitting any common law duty to be imposed, courts perform a conflicts analysis. For example, in *Cleveland* the court first held that Congress by designating the standards as minimum

_____

[17] 49 U.S.C. § 44701(a)(5) provides:

The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing—

. . .

(5) regulations and *minimum standards* for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security.

(emphasis added).

indicated that it did not want to bar states from adopting additional or more stringent standards. 985 F.2d at 1445. After finding "nothing inconsistent with Congress' goal of maximum safety and common law claims," *id.* at 1443, the court compared the state common law duties and the federal regulatory framework to determine whether there was an actual conflict. *Cleveland*, 985 F.2d at 1444-45. Finding no conflict, it found that the state common law action was not preempted. *Id.*

■ However, "[s]tate safety regulation is not preempted only when it conflicts with federal law." *Pacific Gas & Elec. Co.*, 461 U.S. at 212. When it can be otherwise determined that Congress impliedly preempted a field, the conflict question is immaterial: "For if Congress has validly decided to 'occupy the field' for the federal government, state regulations will be invalidated no matter. how well they comport with substantive federal policies." L. Tribe, *American Constitutional Law*§ 6-27, at 497 (1988).

For example, in a case in which state law may not have conflicted with federal law the First Circuit held:

> That may be so—but it is beside the point. So long as occupation of an envisioned field was intended, "any state law falling within th[e] field is pre-empted.". . . The federal interest necessarily predominates, rendering states impotent to act.
>
> . . .
>
> Therefore, the state statute must yield to the force of federal law in the present context, notwithstanding that it is constructed upon values familiar to many and cherished by most, and notwithstanding that it may fit neatly within or alongside the federal scheme.

*French*, 869 F.2d at 6 (*quoting Silkwood*, 464 U.S. at 248); *see also Morales v. Trans World Airlines*, 504 U.S. at 387 (holding that "[t]he pre-emption provision [of the ADA] . . . displace[s] all state laws that fall within its sphere, even including state laws that are consistent with . . . substantive requirements").

Furthermore, the Supreme Court has held that the use of the words "minimum standards" does not furnish a "litmus-paper test" for resolving issues of preemption. *Ray v. Atlantic Richfield*,

435 U.S. 151, 168 n.19 (1977); *see also Wood v. General Motors Corp.*, 865 F.2d 395 (1st Cir. 1988) (holding that although motor vehicle standards are "minimum" in that a manufacturer may make a vehicle safer than required, standards are not "minimum" in relation to preempted state law). When Congress has directed the promulgation of standards on the national level, the states cannot regulate in that field. *See Ray*, 435 U.S. at 163.

■ Thus, because Congress impliedly preempted the field of aviation safety, whether state or territorial and federal law conflict is a pointless inquiry. *See id*. at 166-68; *French*, 869 F.2d at 6. Even though state and territorial standards of care would serve the same goal as federal regulations—improving aviation safety—and even assuming *arguendo* that any state or territorial standard of care would not directly conflict with such "minimum" federal standards, because Congress has preempted the field, this Court holds that state or territorial standards of care in aviation safety may not be imposed.

3. The savings and insurance clauses

Courts have pointed to the FAA's savings and liability insurance clauses as indicating that Congress did not intend to leave injured parties uncompensated. *See, e.g., Hodges*, 44 F.3d at 338 & n.7; *Trinidad*, 932 F. Supp. at 526-27; *see also Cleveland*, 985 F.2d at 1442 (collecting cases in which courts relied on the savings clause to find no preemption of state remedies). The savings clause provides: "A remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120(c). The insurance provision requires that airlines maintain liability insurance "for bodily injury to, or death of, an individual . . . resulting from the operation or maintenance of the aircraft." 49 U.S.C. § 41112(a).

■ The Court agrees that these two clauses evidence Congress' intent to allow for compensation of injured plaintiffs. However, that Congress intended that injured plaintiffs have a common law remedy does not mean that Congress intended the states to determine standards of care. Geoffrey M. Hand, *Should Juries Decide Aircraft Design? Cleveland v. Piper Aircraft Corp. and Federal Preemption of State Tort Law*, 29 U.S.F.L. Rev. 741, 775-77 (1995).

According to the Seventh Circuit, "[s]tatutes of this sort save common law remedies even when federal law exclusively determines the content of the substantive rules." *Bieneman*, 864 F.2d at 471 (referring to the savings clause). The coexistence of standard of care preemption with state remedy preservation is discussed in Part II-A of this opinion.

4. Reserved state power

Courts have held that the states, under their police powers, may regulate aviation safety. *See, e.g., Cleveland*, 985 F.2d at 1443; *Kiefer v. Continental Airlines, Inc.*, 882 S.W.2d 496, 505 (Tex. App. 1994). However, whether the states may invoke their police powers depends on whether the field is federally preempted:

> Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act *unless that [is] the clear and manifest purpose of Congress.*"

*Cleveland*, 985 F.2d at 1441 (*quoting Cipollone*, 504 U.S. at 516 (citation omitted) (emphasis added)); *accord Hodges*, 44 F.3d at 338.

As discussed in Part I-B of this opinion, Congress clearly indicated its intent to federally regulate the standards of care in aviation. Such intent can be inferred from the legislative history of the FAA and the pervasive scheme of regulation that Congress imposed. *See* Part I-B, *infra. But see Cleveland*, 985 F.2d at 1444 (holding that "Congress has not indicated a 'clear and manifest' intent to occupy the field of airplane safety to the exclusion of state common law").

Furthermore, aviation safety is not one of the "historic police powers" of the states. For example, as long ago as 1929, a court concluded, "[i]t is apparent that all of nearly all of these [federal] rules must be applied to both intrastate and interstate craft in order to secure the safety of the latter, and that with respect to these matters the federal regulations must be paramount. Conflicting state rules could not be allowed." *Neiswonger v. Goodyear Tire & Rubber Co.*, 35 F.2d 761, 763 (N.D. Ohio 1929). Not long after, in 1938, the first federal agency charged with regulating aviation

safety, the Civil Aeronautics Authority, was created. Civil Aeronautics Act of 1938, Pub L. No. 706, 52 Stat. 973. Thus, aviation safety has historically been federally regulated.

 Because Congress' "clear and manifest purpose" is to regulate the standards of care in aviation and because the states and territories have not historically regulated such, the Court holds that the states and territories are preempted from exercising their police power in this area.

*II. No Federal Preemption of State and Territorial Remedies*

A. Coexistence of Federal Preemption and State and Territorial Remedies

 Although the Court finds that the standards of care with respect to aviation safety are federally preempted, the Court does not conclude that the injured plaintiffs are left without a remedy. Rather the Court holds that the injured plaintiffs may seek a remedy for violation of the federally established standards of care under state or territorial tort law: "[T]here is nothing inherently inconsistent in the proposition that even if the federal government has entirely occupied the field of regulating an activity a state may simultaneously grant damages for violation of such regulations." *Elsworth v. Beech Aircraft Corp.*, 691 P.2d 630, 634-35 (Cal. 1984).

Federal preemption of the standards of care and state and territorial tort remedies can coexist even though the field of aviation safety is highly federally regulated: "The mere fact that Congress has enacted detailed legislation addressing a matter of dominant federal interest does not indicate an intent to displace state law entirely." *Cleveland*, 985 F.2d at 1441. The Supreme Court in *Silkwood v. Kerr-McGee Corp.* held that a state tort remedy can coexist with the preemption of state regulation of nuclear safety. 464 U.S. at 256. Even though the statutory scheme at issue in *Silkwood* lacked a savings clause such as the one in the FAA, *Bieneman*, 864 F.2d at 472, the Court held that Congress intended to preserve state remedies, "notwithstanding the NRC's exclusive regulatory authority." *Silkwood*, 464 U.S. at 254, 256. *Silkwood* stands for the proposition that "Congress may reserve for the federal government the exclusive right to regulate safety in a given

field, yet permit the state to maintain tort remedies covering much the same territory." *Cleveland*, 985 F.2d at 1441 (*citing Silkwood*, 464 U.S. at 253).

State and territorial remedies are potentially regulatory in nature. *Cipollone*, 505 U.S. at 521; *Cleveland*, 985 F.2d at 1441. The difficulty in finding federal preemption of the standard of care while allowing state and territorial remedies was articulated in *Bieneman v. City of Chicago*:

> Bieneman wants damages, not regulation. Perhaps this is a distinction without a difference. . . . The airport and the air carriers see the award of damages as a signal to stop doing whatever led to the decision, just as the monetary penalty for violating an express substantive rule would lead them to desist. Damages for disobeying an acknowledged rule discourage that disobedience and also induce potential defendants to steer clear of the danger zone, to discontinue conduct that in fact complies with the rule but could be mistaken for noncompliance. It is hard (and costly) to determine facts, and the errors inevitable in litigation may discourage beneficial conduct. So too, excessive awards might discourage conduct that is questionable under existing rules but beneficial on balance (and therefore goes unchallenged by the agency with control of the substantive doctrines).

864 F.2d at 472. Thus, at first blush, allowing state and territorial remedies would seem to thwart Congress' objective of preempting the standards of care.

However, in *Silkwood*, the Supreme Court addressed this conundrum by considering Congress' intent: "Congress did not believe that it was inconsistent to vest the NRC with exclusive regulatory authority over the safety aspects of nuclear development while at the same time allowing plaintiffs like Mr. Silkwood to recover for injuries caused by nuclear hazards." *Silkwood*, 464 U.S. at 258. The Court observed that Congress had decided to "tolerate whatever tension there was" between finding the standard of care preempted and allowing state remedies, and that the "regulatory consequence [of an award of damages] was something that Con-

gress was quite willing to accept." 464 U.S. at 256. In light of the *Silkwood* decision, it cannot be inferred from Congress' intent to federally preempt the standards of care, that Congress also intended to bar state and territorial tort remedies. *See id.*

Although *Silkwood* dealt with the field of nuclear energy, in *Bieneman*, the Seventh Circuit applied this Supreme Court jurisprudence to the aviation context:

> The identity of common law damages and penalties for disobedience to substantive rules could lead to a conclusion that where a state is forbidden to alter the substantive rule, it is forbidden to award damages. *Silkwood v. Kerr-McGee* rejects this equation, however. . . . Notwithstanding the argument (indeed the truism) that an award of hefty compensatory and punitive damages is a method of regulating safety, the Court concluded that federal law does not preempt common law remedies concerning nuclear safety.

*Bieneman*, 864 F.2d at 472. The court in *Bieneman* held that even in areas of air travel that are federally preempted, common law remedies are not preempted. 864 F.2d at 472. Referring to the *Silkwood* and *Pacific Gas & Electric Co.* decisions, the court remarked: "If no preemption is the conclusion notwithstanding the absence from nuclear safety legislation of a statute such as [the savings clause in the FAA], it must be the appropriate treatment of air travel as well." *Id*. In addition, in a case involving allegations of an airplane design defect, the Supreme Court of California relying on *Silkwood* concluded that "in spite of the fact that federal law may have completely occupied the field of regulation of aircraft safety . . . remedies that a party may have under state law" are not abridged by the FAA. *Elsworth*, 691 P.2d at 635. Thus, allowing the Plaintiffs in this case to recover common law remedies even though the standard of care related to aviation safety is federally preempted conforms with Supreme Court precedent as interpreted by the lower courts.

B. No Congressional Intent to Preempt State and Territorial Remedies for Flight Injuries

Congress expressly retained state remedies in the FAA's savings

clause, 49 U.S.C. 40120(c). *Bieneman*, 864 F.2d at 471. The insurance clause, 49 U.S.C. § 41112(a), requiring air carriers to procure insurance to cover bodily injuries, also evidences Congress' intent that the airlines respond to common law claims for personal injury damages. *Hodges*, 44 F.3d at 338; *Trinidad*, 932 F. Supp at 526-27. Because the FAA includes no federal remedies for injured plaintiffs, without a state remedy injured plaintiffs would not be compensated.[18] *See Hodges*, 44 F.3d at 338. Reluctant to leave injured plaintiffs uncompensated, courts have concluded that the savings and insurances clauses, coupled with the lack of a federal remedy, show Congress' intent to preserve state remedies.[19] *See e.g., Hodges*, 44 F.3d at 338; *Margolis*, 318 F. Supp. at 323-24.

Moreover, Congress could not have intended in enacting the FAA or ADA that airlines be shielded from all tort liability. *See Margolis*, 811 F. Supp. at 324. If damages were preempted, this "would have the perverse effect of immunizing the airlines— uniquely among virtually all other industries—from the consequences of their own negligence." *Dudley*, 882 F. Supp. at 207 (citation omitted). Even in aviation matters that Congress has expressly preempted, such as state regulation of "rates, routes, and services," courts have almost uniformly resolved against federal preemption of state remedies for injured plaintiffs. *Margolis*, 811 F. Supp. at 322 (collecting cases); *Romano*, 56 Cal. Rptr. 2d at 432 (same); *Harrell*, 613 N.Y.S.2d at 1004 (same).

Unlike the standards of care in aviation, state and territorial remedies are not preempted because Congress did not intend preemption. To "avoid 'unintended encroachment on the authority of the States, . . . . a court interpreting a federal statute pertaining to

---

[18] No federal remedy is available under the FAA. *In re Mexico City Aircrash*, 708 F.2d 400, 408 (9th Cir. 1983).

[19] The Supreme Court in *Silkwood* drew a similar inference from Congress' lack of inclusion of a federal remedy in the Atomic Energy Act:

Indeed, there is no indication that Congress even seriously considered precluding the use of such remedies either when it enacted the Atomic Energy Act in 1954 or when it amended it in 1959. This silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct. It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.

464 U.S. at 251

a subject traditionally governed by state law will be reluctant to find preemption.'" *Rombom v. United Air Lines, Inc.*, 867 F. Supp. 214, 218 (S.D.N.Y. 1994) (*quoting CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Because state tort remedies are an area traditionally occupied by the states, "congressional intent to supersede states laws must be 'clear and manifest.'" *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990) (citation omitted). Neither the FAA nor ADA clearly or manifestly indicate that Congress intended to preempt state remedies. On the contrary, the savings and insurance clauses and the lack of a federal remedy indicate that Congress intended not to preempt state remedies.

### III. Summary of the Court's Federal Preemption Analysis

In their concern for injured plaintiffs, many courts have recognized common law causes of action in which the standards of care are not federally mandated. This Court disagrees and holds that standards of care related to aviation safety are federally preempted.

Just because Congress expressly preempted rates, routes, and services, does not mean that it intended not to preempt standards of care related to aviation safety. Even though the federal standards are expressed as minimum standards and although in some circumstances the state or territorial rules and federal regulations may not conflict, the states and territories are not free to regulate because Congress has occupied the field of aviation safety. Notwithstanding federal preemption of the standards of care, the savings clause and insurance clauses serve to preserve state and territorial remedies. Finally, because Congress' clear and manifest intent is to regulate aviation safety, and because regulation of aviation safety has not been an historic police power of the states and territories, regulation of aviation safety is not reserved to the states and territories.

Absent in the existing jurisprudence is application of the federal preemption analysis prescribed by the Supreme Court. The courts that have found against federal preemption have not evaluated whether Congress intended that aviation safety be federally preempted by considering whether Congress' purposes and objective would be thwarted by state or territorial aviation safety law or

169

whether Congress had set up a scheme of pervasive federal regulation of aviation safety. Nor have they considered the nature of aviation. Although many courts have found the area of aviation safety not to be federally preempted, none have done so after strictly applying these federal preemption tests.

Because Congress' intent is to regulate aviation safety federally, the Court finds the standards of care in aviation safety to be federally preempted. However, injured plaintiffs are not left without a remedy. Congress has expressly preserved state remedies in the savings clause. The Court's holding rests on the foundation that preemption of state and territorial standards of care can coexist with no preemption of state and territorial remedies. Thus, it should assuage many of the misgivings of the courts that previously have been confronted with this issue and have been reluctant to leave injured plaintiffs without a remedy.

*IV. New Trial*

According to Professors Wright, Miller, and Kane, "[a]ny error of law, if prejudicial, is a good ground for a new trial." 11 Charles Alan Wright et. al, Federal Practice and Procedure § 2805, at 55 (2d ed. 1995). The Third Circuit has held that "the district court's power to grant a new trial motion is limited to those circumstances where a miscarriage of justice would result if the verdict were to stand." *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282 (3d Cir. 1993) (quotation omitted). Because the case at bar involves a prejudicial error of law concerning standards of care which would result in a miscarriage of justice if the verdict were to stand, a new trial is warranted. *See also Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 30 (1962) (holding that when a general verdict is rendered, if "upon any one issue error was committed, either in the admission of evidence or in the charge of the court, the verdict cannot be upheld").

■■■ When the standards of care are federally preempted, the jury must not be allowed to apply any standards but the federal standards. *See In re TMI*, 67 F.2d at 1106-7; *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994). Allowing a jury to apply any other standards, would, in effect, be permitting the jury to make its own regulations. States and territories are pre-

empted not only from enacting statutes, but also from imposing damages for violations of standards set by jury determinations. *In re TMI*, 67 F.3d at 1106 n.8. The jury's role, therefore, is limited to determining whether the federally established standards of care were breached. *See Elsworth*, 691 P.2d at 637 (upholding a verdict in which the jury found the defendant liable for negligently violating FAA safety regulations).

The Seventh Circuit in *Bieneman* discussed the implications of preemption of the standards of care:

> A word on what this means. . . . A state court could not award damages against O'Hare or its users for conduct required by these regulations, or for not engaging in . . . procedures that the Federal Aviation Administration considered but rejected as unsafe. . . . [A] state may not use common law procedures to question federal decision or extract money from those who abide by them. There may be, on the other hand, aspects of O'Hare's operations that offend federal law, or that federal norms do not govern. . . .The essential point is that the state may employ damage remedies only to enforce federal requirements (as in *Silkwood*) or to regulate aspects of airport-operation over which the state has discretionary authority.

864 F.2d at 472-73.

In *TMI II*, a case concerning nuclear energy regulation, the Third Circuit held that compliance with the federal standards conclusively established that the applicable standards of care were met. Otherwise the "'[State] law would be inconsistent with federal law and the federal law would take precedence.'" *TMI II*, 940 F.2d at 859 (*quoting O'Conner v. Commonwealth Edison Co.*, 748 F. Supp. 672 (C.D. Ill. 1990)). In *In re TMI* the Third Circuit held that neither a state legislature nor a jury would be allowed to determine the standards of care with respect to nuclear safety. 67 F.3d at 1106 n.8. Thus, because the standards of care are federally preempted, the states must adopt the federal standards as the duties owed by defendants. *O'Conner*, 13 F.3d at 1105.

In this case, the jury was allowed to consider standards other than the federal standards of care. Although the jury was informed

of the federal standards of care, they were told that such standards were minimum standards: "FAA regulations only establish minimum requirements for air carriers' or airlines. The defendant may have been required to do more under the circumstances."

The jury was permitted to create its own standard as to when it is reasonable for a passenger to fasten their seat belts despite a federal standard requiring "[e]ach passenger [to] . . . fasten his or her safety belt about him or her and keep it fastened while the 'Fasten Seat Belt' sign is lighted." 14 C.F.R. 121.317(f) (1996). The federal regulation does not make a passenger's duty dependent on any enhanced warning from the pilots or on whether the flight attendants check whether passengers are wearing their seat belts. Yet the jury was instructed that "[i]f the [pilot's] warning . . . is insufficient to come to the attention of the passengers, then the passengers are not contributorily negligent for not heeding the warning, and the pilot and airline is still liable to the passengers for any injury caused by the pilot's act." The jury was further charged that "[i]f you find that during the incident which is the subject of this case, the flight attendants or crew did not use reasonable care to adequately warn and inspect the safety of the passengers, then you may find for one or more of the plaintiffs."

According to these instruction, even if the jury determined that the seat belt sign had been lit at the time of the incident and that the Plaintiffs had not been wearing their seat belts, the jury still could have found the Plaintiffs to be not contributorily negligent. The jury was permitted to consider whether the pilot should have made additional warnings in addition to lighting the seat belt sign and whether the flight attendants should have supplemented the lighted seat belt signs with warnings and inspection.

At trial, evidence of standards of care other than federally mandated standards of care were introduced, particularly with respect to passenger warnings. Expert witness Dr. Cunitz testified for the Plaintiffs:

> I hold an opinion that the pilots . . . should have ade-
> quately and fully warned . . . the passengers. . . that
> we're about to encounter or there's a possibility of
> encountering some very rough weather and you need to

take appropriate precautions and make yourself ready both physically by belting in tightly and so on. . . . . . .

I also believe that they should have made a P.A. [public address system] announcement . . . 2 or 3 minutes just immediately before so that people could in fact prepare themselves and say all right another minute or two we're going to be in it so the message, the warning needed to have been given in a very timely fashion.

(Tr. Trial Vol. 5 at 16, 17, 18)

During cross-examination Dr. Cunitz was asked:

Dr. Cunitz, I believe I heard you testify earlier that you must advise passengers of the potential for danger whenever you tell them to put on their seat belt or else we're not giving them enough information to let them make a reasonable decision as to why they [should] put on their seat belt?

He answered: "If there's a potential for that danger yes, sir."

(Tr. Trial Vol. 5 at 53)

Dr. Cunitz further testified:

[The pilots] needed to tell [the flight attendants] that there is . . . potential for severe turbulence. You are to warn the passengers of this. If they don't do it themselves you are to make sure everybody's wearing their seat belts, that they return from the lavatories, get them out of there and get them in their seats and get their seat belt on tight.

(Tr. Trial Vol. 5 at 79)

Counsel for the Plaintiffs referred to such evidence in the opening statement and the closing argument. In opening, Plaintiffs' counsel stated:

[The pilot] has to tell you what's going on and he has to warn you, and he has to warn you in a way that you can understand what's going to happen to you. . This Mr. Cunitz—Dr. Cunitz will tell you even if they had turned

173

on the seat belt signs that's not enough, there's a movie going on, people walking up and down, there's bells going off all the time, nobody would notice it. You got to get on that loud speaker and you got to talk to um. You got to say danger is ahead, be careful, buckle up, don't get out of your seat.

. . .

The other thing that Dr. Cunitz will tell you should have happened these stewardesses should have been going around and talking to each of these people and saying you need to get your seat belts on and stay in your seats.

(Tr. No. 290 at 51).

Plaintiff's counsel argued in rebuttal that once the captain had told the passengers that they were free to move around, he had to tell them when they need to be seated and "in a way that lets them know that they've really got to take their seats." (Tr. 8/24/95 at 16). According to Plaintiffs' counsel "the flight crew had an obligation to make sure the gravity of the situation was properly conveyed to the passengers, and we say that that was not done and we know that from the evidence." (Tr. 8/24/95 at 33).

■ The jury instructions, the evidence presented at trial, the Plaintiffs' opening statement and closing argument, all indicate that the jury considered evidence beyond the federal requirements. American was prejudiced because the jury was permitted to find the Plaintiffs not contributorily negligent under lower and contradictory standards than the mandatory obligations imposed by federal law. Thus, the Court orders a new trial. An appropriate order is attached.

### ORDER

This matter comes before the Court on Defendant American Airlines, Inc.'s motion for judgment as a matter of law, or in the alternative a new trial with costs, attorney fees and transfer of the case to the Southern District of New York and on the Plaintiffs' motion to reconsider the exclusion of certain expert testimony. After consideration of such motions and in accordance with the opinion of even date, it is hereby ORDERED that the Defendant's motion for a new trial is GRANTED without costs or attorney fees.

The Plaintiffs' motion to reconsider the exclusion of certain expert testimony is DENIED without prejudice. With respect to the Defendant's motion to transfer venue, the Defendant has 20 days from the issuance of this order to submit a supplementary brief, the Plaintiffs may respond within 10 days thereafter and the Defendants may reply within 5 days of the Plaintiffs' responses. A hearing on the Defendant's motion to transfer venue will be scheduled subsequently.

ENTERED this 5th day of June 1997.