**Sanford S. WADLER, Plaintiff,**

v.

**BIO-RAD LABORATORIES, INC., et al., Defendants.**

**Case No. 15-cv-02356-JCS**

United States District Court, N.D. California.

Signed October 23, 2015

Kevin Brooke Clune, Michael John von Loewenfeldt, Kenneth Paul Nabity, Kerr & Wagstaffe LLP, San Francisco, CA, for Plaintiff.

Linda M. Inscoe, James Jou Chang, Marcy Christina Priedeman, Robert E. Sims, Latham & Watkins, LLP, San Francisco, CA, Scott Curtis Jones, Latham and Watkins LLP, Washington, DC, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

JOSEPH C. SPERO, Chief Magistrate Judge

### I. INTRODUCTION

Plaintiff Sanford Wadler brings a whistleblower action against Defendants Bio-Rad Laboratories, Inc. ("Bio-Rad") and the individual members of Bio-Rad's Board of Directors, contending he was wrongfully terminated in retaliation for investigating and reporting to Bio-Rad's upper-level management possible violations of the Foreign Corrupt Practices Act ("FCPA") in China. Wadler asserts claims under the Sarbanes-Oxley Act, the Dodd-Frank Act,

and California state law. Presently before the Court is Defendants' Motion to Dismiss the Complaint ("Motion"), which came on for hearing on September 4, 2015 at 9:30 a.m. The parties submitted supplemental briefs on September 25, 2015. For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

## II. BACKGROUND

### A. The Complaint

In the Complaint, Wadler alleges that he became Bio-Rad's general counsel in 1989 and served in that position for nearly 25 years. Compl. ¶ 2. According to Plaintiff, Bio-Rad is a Fortune 1000 company that manufactures and sells products and equipment around the world. *Id.* ¶ 6. Because Bio-Rad sells many of its products to hospitals, universities, and similar public entities and officials, it must abide by the terms of the FCPA, which "forbids the company or its agents from engaging in bribery and kickback schemes involving public officials and requires that companies maintain accurate accounting records and put in place adequate internal controls or face significant fines and possible criminal punishment." *Id.* ¶¶ 4, 6; Opposition at 2 (citing 15 U.S.C. §§ 78dd–2, 78ff).

Wadler alleges that "[i]n 2009, Bio-Rad's corporate officers became aware that certain of its employees and agents in Vietnam, Thailand, and Russia may have violated provisions of the FCPA." *Id.* ¶ 14. Bio-Rad "recently admitted the existence of such violations in a, consent decree and agreed to pay $55.1 million in fines for this conduct as it related to Bio-Rad's operations in Thailand, Vietnam, and Russia." *Id.* ¶¶ 14-15. After discovering the illegal activities in Thailand, Vietnam and Russia, Bio-Rad hired the law firm Steptoe and Johnson LLP to investigate whether Bio-

Rad employees were engaging in bribery in China—"a country where Bio-Rad had significantly greater amounts of sales than Thailand, Vietnam, or Russia and where corruption is notoriously widespread." *Id.* ¶¶ 16-17. According to Wadler, Steptoe & Johnson concluded that "there was no evidence of improper payments." *Id.* ¶ 17.

Wadler alleges that in 2011, he discovered that although Bio-Rad's sales in China were "in the hundreds of millions of dollars over a number of years," there was virtually no documentation supporting Bio-Rad's China-related sales. *Id.* ¶¶ 20-21. Wadler was concerned that the lack of documentation was a violation of the FCPA's recordkeeping requirements and that it "suggested efforts to conceal violations of the FCPA's anti-bribery provisions." *Id.* ¶ 22. Wadler "repeatedly tried to obtain documents from Bio-Rad's CEO, CFO, and other key executives, but despite indicating that they would assist in tracking down such documents, these executives repeatedly failed to do so." *Id* ¶ 21. According to Wadler, in 2012, he was "finally able to uncover a few documents" and they provided "unambiguous evidence of potential bribery" by Bio-Rad in China. *Id.* ¶ 24. He also learned in early 2013 that "certain standard language concerning the need for FCPA compliance had been removed (without his knowledge or approval) from documents translated into Chinese and used for Bio-Rad's operations in China. *Id.* ¶ 27.

Wadler alleges that the CEO, CFO and other members of management repeatedly "stonewall[ed]" him, leading him to "become suspicious that corruption issues in China were known to senior management, and that management was intentionally blocking his efforts to uncover evidence of bribery and related misconduct." *Id.* ¶ 28.

1. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to U.S.C. § 636(c).

Wadler alleges that he then took his concerns to the Audit Committee of the Board of Directors, which reengaged Steptoe and Johnson to investigate these violations. *Id.* ¶¶ 29-30. Wadler objected to the appointment of Steptoe and Johnson on the basis that it "had a clear conflict of interest," having failed to uncover in 2011 any FCPA violations in China; according to Wadler, "any finding in 2013 would have demonstrated Steptoe's prior malpractice." *Id.* ¶ 30.

Wadler alleges that Steptoe and Johnson again concluded that there was no evidence of improper payments in connection with Bio-Rad's China sales and reported its finding at a meeting in March 2013 between Bio-Rad, Steptoe and Johnson and its outside auditor, Ernst & Young. *Id.* ¶ 32. According to Wadler, he challenged this conclusion at the meeting and stated that "thirty percent of the documents concerning Bio-Rad's China operations that he had reviewed contained discrepancies related to the shipment volume." *Id* In response, the Steptoe and Johnson partner who had conducted the investigations in both 2011 and 2013 stated that he had "simply not addressed those issues." *Id.* Wadler alleges that he "was effectively shut out of the investigation over his repeated objections that he should be included." *Id.* ¶ 33.

Soon after the March 2013 meeting, on June 7, 2013, Bio-Rad terminated Wadler. *Id.* ¶ 35. The termination was "effectuated by the CEO" but the decision to terminate Wadler "was made by a vote of the entire Board." *Id.* In particular, Wadler alleges that Board members Louis Drapeau, Alice N. Schwartz, Albert J. Hillman and Deborah Neff made the decision to terminate Wadler and "were aware that Wadler had reported bribery, books-and-records violations, and related misconduct to persons with supervisory authority over him and to other persons at Bio-Rad who had the authority to investigate, discover, or terminate such misconduct." *Id.* ¶ 38. Wadler further alleges that he was terminated because he was investigating potential FCPA violations and because he reported his concerns "up the ladder" "when it became clear that the company was not taking reasonable steps to investigate and remedy FCPA violations." *Id.* ¶ 39.

Wadler alleges that throughout his employment he had always reported to the CEO, first David Schwartz and then Norman Schwartz, and that he had never been told that his work was deficient; in December 2012, Norman Schwartz gave Wadler a positive performance review, promoted him to Executive Vice President and gave him a raise. *Id.* ¶ 37. According to Wadler, at the time of his termination, Bio-Rad had been scheduled to give a report to the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") just a few weeks later "regarding the status of Bio-Rad's internal FCPA investigations." *Id.* ¶ 41. Bio-Rad's outside counsel, Davis Polk, gave the presentation at that meeting. *Id.* ¶ 42. According to Wadler, Bio-Rad was concerned that its termination of Wadler might reflect poorly on the company and therefore, it disclosed and attempted to rebut the concerns Wadler had expressed regarding possible FCPA violations in China. *Id.* Wadler alleges that "the presentation given to the SEC and the DOJ was a self-serving attempt to avoid potential negative repercussions regarding the improper activities Bio-Rad engaged in." *Id.*

Wadler alleges that Bio-Rad later "admitted publicly that it was, in fact, engaging in some of the very misconduct Wadler had complained about," disclosing in its March 8, 2013 10K statement with the SEC that it had "identified significant deficiencies in [its] internal control over financial reporting, including the unauthorized issuance of distributor contracts at [its]

Chinese subsidiary, [its] lack of control over pricing and [its] ineffective methods of analyzing credit risk and in some instances, the lack of sufficient documentation for the time of revenue recognition." *Id.* ¶ 34 (internal quotations omitted). According to Wadler, Bio-Rad's outside auditors Ernst & Young also resigned. *Id.* ¶ 44. Wadler alleges on information and belief that "material deficiencies and substantial disagreement between the auditors and Bio-Rad's senior leadership contributed to the resignation of the auditors." *Id.*

Wadler asserts the following claims in his Complaint: 1) retaliation in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A (Bio-Rad and the individual Board members); 2) retaliation in violation of the Dodd-Frank Act, 15 U.S.C. § 78u–6 (Bio-Rad and the individual Board members); 3) Retaliation in Violation of California Labor Code section 1102.5 (Bio-Rad);[2] 4) wrongful termination in violation of public policy (Bio-Rad); 5) nonpayment of wages under California Labor Code sections 201, 227.3 (Bio-Rad); 6) waiting time penalties under California Labor Code section 203 (Bio-Rad).

## B. Administrative Proceeding

On November 29, 2013, Wadler faxed his initial complaint, in the form of a letter, to the Department of Labor's Occupational Safety & Health Administration ("DOL"), alleging that he was terminated for engaging in protected activity under Sarbanes-Oxley. *Id.* ¶ 58; *see also* Declaration of Linda Inscoe in Support of Defendants' Motion to Dismiss ("Inscoe Decl."), Ex. A (DOL Complaint). The DOL Complaint states that it is "a complaint under the Sarbanes-Oxley Act against Bio-Rad Laboratories, Inc. in Hercules, CA." *Id.* at 1. The DOL Complaint goes on to state, "I was the Executive Vice President, Secretary and General Counsel of Bio-Rad until I was terminated on June 7, 2013 by the Chief Executive Officer of the corporation, Norman Schwartz, for engaging in whistle-blowing activities." *Id.* Wadler states in the DOL Complaint that "the actual voting control of [Bio-Rad] is in the hands of the founding Schwartz family," that Norman Schwartz, the son of the founder, is the CEO and Chairman of the Board," and that "[h]is mother, Alice Schwartz, is also on the Board." *Id.* In the DOL Complaint, Wadler states that he was "terminated from [his] long term employment at Bio-Rad by the CEO." *Id.* at 5. The factual allegations in the DOL Complaint closely track the allegations in this action. *Id.*

In its response to the DOL Complaint, Bio-Rad argued that Wadler could not "make the prima facie showing that his alleged behavior was protected" and submitted declarations by, *inter alia*, Board Members Louis Drapeau and Norman Schwartz. *See* Request for Judicial Notice in Support of Plaintiff Sanford S. Wadler's Opposition to Defendants' Motion to Dismiss ("RJN"), Ex. B (Letter from L. Inscoe to J. Paul responding to DOL Complaint, dated January 28, 2014).[3] Bio-Rad

---

2. This claim is listed in the caption of the Complaint, but the heading for Claim Three does not cite California Labor Code section 1102.5 —an omission that Wadler contends is a typographical error. Opposition at 21 n. 18. In light of the caption on the face of the Complaint, the Court finds that the failure to include a citation to section 1102.5 was an obvious clerical error, that Defendants understood that Plaintiff was asserting a claim under that section (as evidenced by the Motion itself, which seeks dismissal of the claim), and that the Complaint need not be amended.

3. The Court grants Plaintiff's request to take judicial notice of the documents attached to the RJN. Exhibit A to the RJN is Bio-Rad's 2015 10-K Report, dated February 17, 2015, and is subject to judicial notice on the basis that it is an SEC filing. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n. 2 (9th Cir. 2006) (SEC filings subject to judicial notice).

listed all of the Board members as witnesses in the DOL proceeding. *See* RJN, Ex. C (Bio-Rad's witness list).

On January 15, 2015, Wadler sought leave to amend his DOL Complaint to "clarify that he [sought] relief from both Bio-Rad and the members of its Board of Directors individually—not just against the Company itself." RJN, Ex. D (Motion to Amend) at 1. He stated in the Motion to Amend that although it might not be necessary to amend the complaint because the Board Members were "sufficiently identifie[d]" in the original DOL Complaint, he sought to do so "in an abundance of caution to ensure that he [was] able to obtain full relief against the persons who actually made the decision to retaliate against him by terminating his employment." *Id.* at 1. The investigator who was presiding over the matter asked the parties for additional briefing on the question of whether board members can be held individually liable under Sarbanes-Oxley, and DOL ultimately "accept[ed] the revised complaint for investigation pending receipt of additional evidence pursuant to the liberal amendment standard set forth in Chapter 3(VI)(B)(2) of OSHA's Whistleblower Investigations Manual." *See* RJN, Ex. F.

After the OSHA proceeding had been pending for more than 180 days, Wadler initiated the instant action. *See* RJN, Ex. G. In a June 25, 2015 letter to Wadler's counsel, OSHA Regional Supervisory Investigator Joshua B. Paul confirmed that Wadler had properly availed himself of Sarbanes-Oxley's "kick-out" provisions allowing Wadler to withdraw the proceeding to U.S. District Court because more than 180 days had passed since the DOL Complaint had been filed and neither Wadler nor his counsel had acted in bad faith. *Id.*

### C. Contentions of the Parties

Bio-Rad challenges Wadler's claims on several grounds. First, it contends the claims against the individual Board members, asserted under Sarbanes-Oxley and Dodd-Frank, should be dismissed with prejudice because neither of those laws permits suits against individual directors. Motion at 4-6. In addition, as to the claims against the Directors under Sarbanes-Oxley, Defendants contend the claims are untimely because Wadler did not move to amend his DOL Complaint to add the Directors until the 180-day period for filing an administrative complaint had already expired. *Id.* at 6-7.

Second, Bio-Rad contends Wadler's claim under Dodd-Frank fails because Wadler did not provide any information to the SEC. *Id.* at 7-10. Citing the approach taken in the Fifth Circuit—the only Circuit Court to have considered the issue—Bio-Rad argues that the plain language of Dodd-Frank makes clear that the anti-retaliation provisions are only available to "whistleblowers" and the term "whistleblower" does not include individuals who only provided information of a possible violation of securities law to others within the company. *Id.* (citing *Asadi v. G.E. Energy (U.S.A), L.L.C.*, 720 F.3d 620 (5th Cir.2013)).

Third, Defendants assert Wadler's claim under California Labor Code section 1102.5 fails, as a matter of law, because Wadler does not allege that he made a whistleblower report to law enforcement authorities, as required under section 1102.5(b). *Id.* at 10. Further, Defendants contend, Wadler cannot state a claim under section 1102.5(c), which applies to those who have "refused to participate in

---

Exhibits B-G are subject to judicial notice on the basis that they are documents that are part of the history of the administrative proceeding. *See Transmission Agency of N. Cali-* *fornia v. Sierra Pac. Power Co.*, 295 F.3d 918, 924 (9th Cir.2002) (taking judicial notice of adjudicative facts before administrative tribunal).

activity that would violate federal or state law." *Id.* According to Defendants, Wadler may seek to invoke this section on the basis that he "refused to participate in a cover-up of allegedly unlawful activity," but he has not alleged facts sufficient to state a claim under this theory. *Id.* at 11 (citing *Banko v. Apple*, 20 F.Supp.3d 749 (N.D.Cal.2013)).

In his Opposition, Wadler points out that Defendants have not challenged the sufficiency of his claim against Bio-Rad (as opposed to the individual Directors) under Sarbanes-Oxley or his claims against Bio-Rad for wrongful termination in violation of public policy, failure to pay wages under California Labor Code sections 201 and 227.3 and waiting time penalties under California Labor Code section 203. Opposition at 1. Wadler rejects Defendants' assertion that he may not sue the Directors individually under Sarbanes-Oxley or Dodd-Frank. *Id.* at 7–12. Wadler contends Sarbanes-Oxley permits actions against individual Board members because it provides that "officer[s], employee[s], contractor[s], subcontractor[s], or agent[s]" can violate the Act. *Id.* at 7 (quoting 18 U.S.C. § 1514A(a)). Wadler argues that a Board member may be liable as an "agent" and that Defendants have pointed to no case that holds otherwise. *Id.* Wadler also cites a case in which "the Fourth Circuit...explicitly held that individual board members *are* liable when they retaliate against an employee for blowing the whistle." *Id.* at 8 (citing *Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 663–664, 675 (4th Cir.2015) (emphasis in original)). He also notes that at least Defendant Norman Schwartz, who is Bio-Rad's CEO, can be held liable as an "officer," even if the term "agent" does not encompass Board members. *Id.* at 10.

Similarly, Wadler asserts, Dodd-Frank allows for actions to be brought against individual Board members. *Id.* at 11–12.

Dodd-Frank permits an action to be brought against "an employer," and although the statute does not define "employer," the proper interpretation of this term includes individuals, Wadler contends. *Id.* In support of this reading of Dodd-Frank, Wadler points to the Fair Labor Standards Act ("FLSA"), which he contends contains analogous anti-retaliation provisions and has been held to permit actions against individual defendants. *Id.* at 11 (citing *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir.2013); *Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir. 1999)). On the other hand, he distinguishes Title VII and the Americans with Disabilities Act ("ADA"), in which the term "employer" has been held to exclude individuals, on the basis that these statutes expressly exempt from the term "employer" entities that employ fewer than a certain "minimum number" of employees, reflecting a Congressional intent to exclude individuals. *Id.* at 11 n. 9 (citing *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir.1993) (Title VII); *Walsh v. Nevada Dep't of Human Res.*, 471 F.3d 1033, 1038 (9th Cir.2006) (ADA)). Because Dodd-Frank does not include any such provision, Wadler asserts, the interpretation of the term "employer" in cases involving the ADA and Title VII does not apply here. *Id.*

Wadler also contends his claims against the individual Board members under Sarbanes-Oxley are timely. *Id.* at 13-14. In particular, he contends his initial DOL Complaint, which was not on pleading paper, was sufficient to name the individual defendants. *Id.* at 13. He points out that there are no pleading requirements for whistleblower complaints and argues that while he did not formally name any particular defendant in any caption (as there was none), the individual members were on notice of Wadler's claims from the outset. *Id.* He rejects Defendants' reliance on the

fact that he filed a motion to amend to add the individual defendants in the administrative action, arguing that it does not support Defendants' position because that motion was ultimately granted. *Id.* at 14.

Wadler argues that the Court should reject Defendants' invitation to follow the approach of the Fifth Circuit on the question of whether Dodd-Frank offers protection to internal whistleblowers. *Id.* at 16–20. Recognizing that there is a split of authority among the district courts in the Ninth Circuit on this issue, Wadler argues that the better reasoned decisions have found that Dodd-Frank is ambiguous as to the definition of "whistleblower" and therefore, that the interpretation of the SEC is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 865, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Id.* at 15. The SEC, in turn, has concluded that Dodd-Frank extends anti-retaliation protection not only to individuals who have brought information concerning possible securities law violations to the attention of the SEC but also to internal whistleblowers. *Id.* at 16–17; *see also* Docket No. 29 (Amicus Curiae Brief by SEC, filed in support of Plaintiff, addressing the question of whether Dodd-Frank protects internal whistleblowers against retaliation).

Finally, Wadler argues that he has alleged sufficient facts to state a claim under California Labor Code section 1102.5. *Id.* at 20–24. He does not dispute that he has not alleged facts sufficient to state a claim under subsection (b), but argues that he has sufficiently pled a violation under subsection (c). *Id.* at 21. According to Wadler, contrary to the assertion of Defendants that he has only included "general and conclusory" allegations in his complaint that he refused to aid and abet illegal activity, Wadler has alleged "in vivid detail" the facts necessary to "flesh out" his claim that he refused to discontinue his investigation of Bio-Rad's misconduct. *Id.* at 21–24. Wadler further argues that Defendants are incorrect in their assertion that in order to state a claim under section 1102.5(c) Wadler must show that Bio-Rad explicitly asked him to violate the law and Wadler expressly refused to do so. *Id.* According to Wadler, the law does not require that employers "state their illicit motivations"; rather, courts consider the import of the parties' interactions. *Id.* at 23.

## III. ANALYSIS

### A. Legal Standard under Rule 12(b)(6)

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.1983). Generally, a plaintiff's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that "[a] pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1990). A plaintiff need not plead a prima facie case in order to survive a motion to dismiss pursuant to Rule 12(b)(6). *Swierkiewicz v. Sorema N.A.*, 534

U.S. 506, 514–15, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *see also Starr v. Baca*, 652 F.3d 1202 (9th Cir.2011) (reaffirming the holding of *Swierkiewicz* in light of *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A complaint must however "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. 1955 (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[ ] the court to·draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

### B. Defendants' Challenges to Federal Claims

#### 1. Statutory Overview

##### a. Sarbanes-Oxley Act of 2002

"To safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation, Congress enacted the Sarbanes-Oxley Act of 2002, 116 Stat. 745." *Lawson v. FMR LLC*, —— U.S. ——, 134 S.Ct. 1158, 1161, 188 L.Ed.2d 158 (2014) (citing S.Rep. No. 107-146, pp. 2-11 (2002)). One of the measures enacted in Sarbanes-Oxley to achieve these goals was the protection of whistleblowers. *Id.* In particular, Sar-

banes-Oxley provides that "no [publicly traded] company ... or any officer, employee, contractor, subcontractor,· or agent of such company" may retaliate against an employee for "provid[ing] information, caus[ing] information to be provided, or otherwise assist[ing] in an investigation" of conduct that the employee reasonably believes is a violation of securities law or the SEC's rules where "the information or assistance is provided to or the investigation is conducted by," *inter alia*, "a person with supervisory authority over the employee (or·such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)." 18 U.S.C. § 1514A(a)(1)(C).

Under Sarbanes-Oxley, an aggrieved whistleblower can initiate an administrative action by filing a complaint with the Secretary of Labor, which must be filed "not later than 180 days after the date on which the violation occurs, or after the date on which the employee became aware of the violation." 18 U.S.C. §§ 1514A(b)(1)(A) & 1514A(b)(2)(D). In addition, "if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant," an action seeking de novo review may be brought in federal district court. 18 U.S.C. § 1514A(b)(1)(B).

##### b. Dodd-Frank Act

In 2010, Congress established a new whistleblower program under the Dodd-Frank Act, which added Section 21F to the Securities Exchange Act of 1934.· *See* 15 U.S.C. § 78u–6. "Section 21F 'encourages individuals to provide information relating to a violation of U.S. securities laws' through 'two related provisions that: (1) require the SEC to pay significant. monetary awards to individuals who provide information to the SEC which leads to a successful enforcement action; and (2) cre-

ate a private cause of action for certain individuals against employers who retaliate against them for taking specified protected actions.' " *Somers v. Digital Realty Trust, Inc.*, No. C–14–05180 EMC, 119 F.Supp.3d 1088, 1094, 2015 WL 4483955, at *3 (N.D.Cal.2015) (quoting *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 623 (5th Cir.2013)).

Dodd-Frank defines a "whistleblower" as "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws to the Commission, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u–6(a)(6). Dodd-Frank's anti-retaliation provision appears to sweep more broadly, however. In particular, it forbids an "employer" from retaliating against a whistleblower not only for "providing information to the Commission" or "initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information" but also for "making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. [§§ ] 7201 et seq.), this chapter, including section 78j-1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission." 15 U.S.C. §§ 78u–6(h)(1)(A)(i)–(iii). As discussed above, Sarbanes-Oxley prohibits retaliation against whistleblowers who have provided information to an individual with "supervisory authority over the employee" or "such other person working for the employer who has the authority to investigate, discover, or terminate misconduct," even if the whistleblower did not provide information about possible illegal conduct to the SEC. 18 U.S.C.A. § 1514A(1)(C). Dodd-Frank, in contrast to Sarbanes-Oxley, does not require that a whistleblower exhaust any administrative remedies before bringing an action in federal district court. *See*

*Somers*, 119 F.Supp.3d at 1094–95, 2015 WL 4483955, at *4. In addition, the limitations period for bringing an action under Dodd-Frank is between six and ten years, in contrast to the 180-day limitation period under Sarbanes-Oxley. *See id.* (citing 15 U.S.C. § 78u-6(h)(1)(B)(iii)).

c. Exchange Act Rule 21F-2(b)(1)

Dodd-Frank provides that "[t]he Commission shall have the authority to issue such rules and regulations as may be necessary or appropriate to implement the provisions of this section consistent with the purposes of this section." 15 U.S.C. § 78u–6(j). In June 2011, the SEC issued final rules interpreting and implementing Section 21F of Dodd-Frank. *See* Securities Whistleblower Incentives and Protections (Adopting Release), 78 Fed.Reg. 34300, 34301–34304 (June 13, 2011). Exchange Act Rule 21F-2(b)(1) states that for the purposes of the whistleblower-protection program, "you are a whistleblower if ... [y]ou provide information in a manner described in ... 15 U.S.C. 78u–6(h)(1)(A)." *See* 17 C.F.R. § 240.21F–2(b)(1). In other words, the SEC interprets Dodd-Frank as offering protection from retaliation even for individuals who do not report possible violations to the SEC, so long as they qualify for whistleblower protection under Sarbanes-Oxley based on internal whistleblowing.

### 2. Whether Wadler Can Sue Individual Directors under Dodd-Frank or Sarbanes-Oxley

#### a. Sarbanes-Oxley

##### i. Liability of Individual Directors

Surprisingly, there is scant case law that addresses whether directors who engage in retaliatory conduct may be held individually liable under Sarbanes-Oxley. Wadler is able to point to one Fourth Circuit case in which the court of appeals affirmed a jury award imposing individual

liability under Sarbanes-Oxley on the chairman of the board of directors on the basis that he was "involved in the decision to terminate" the plaintiff. *See Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 675 (4th Cir.2015). In that case, as is alleged here, the actual decision to terminate was made by a vote of the entire board of directors. *Id.*[4] The court in *Jones* did not, however, directly address the basis for finding that the defendant in that case could be held individually liable.[5] Although a close call, the Court finds that directors may be held individually liable under Sarbanes-Oxley for the reasons set forth below.

"In determining the meaning of a statutory provision, 'we look first to its language, giving the words used their ordinary meaning.'" *Lawson v. FMR LLC*, —— U.S. ——, 134 S.Ct. 1158, 1165, 188 L.Ed.2d 158 (2014) (quoting *Moskal v. United States*, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (citation and internal quotation marks omitted)). Here, the difficulty lies with the word "agent" as used in Section 1514A(a), and in particular, whether that term encompasses directors. The authority cited by the parties does not provide a convincing answer to this question.

Wadler cites to Black's Law Dictionary, which defines an agent as "[s]omeone who is authorized to act for or in place of another; a representative." Black's Law

Dictionary (10th ed. 2014). According to Wadler, "[b]oard members, who after all are responsible for making the most important decisions for the company, are clearly authorized to act on behalf of the company and thus qualify as 'agents.'" Opposition at 8. Wadler does not, however, cite any case that has held as much. Further, Wadler's argument is undermined by the fact that Black's Law Dictionary defines "corporate agent" as "[a]n agent authorized to act on behalf of a corporation; broadly, all *employees and officers* who have the power to bind the corporation." Black's Law Dictionary (10th ed. 2014) (emphasis added).

Defendants, on the other hand, point to the Restatement (Third) of Agency § 1.01, which provides:

> Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

Restatement (Third) of Agency § 1.01. As Defendants point out, in the comment to this provision it is expressly stated that "the directors are neither the shareholders' nor the corporation's agents as defined in this section." *Id.* cmt. f(2). What Defendants fail to note is that in the Reporter's

---

4. Defendants attempt to distinguish this case on the basis that "the plaintiff in *Jones* [did not] bring claims against non-officer board members." Reply at 4. This assertion is incorrect. There is no suggestion in *Jones* that the chairman who was held personally liable ("Phillips") was an officer of the corporation in that case. Rather, he is consistently identified as the "chairman."

5. The Department of Labor appears to have struggled with this issue in the administrative proceeding as well, asking the parties for supplemental briefing on the question of whether

"a member of the Board of Directors of a company covered under [Sarbanes-Oxley] [was] necessarily an 'officer, employee, contractor, subcontractor, or agent' of that company as contemplated by 18 U.S.C. § 1514A(a)[.]" RJN, Ex. F. Although the Department of Labor ultimately accepted the amended complaint adding the individual board members as defendants, it does not appear to have resolved the question, noting only that it accepted the complaint under the liberal amendment standards that apply in OSHA proceedings "pending receipt of additional evidence."

Notes for this comment, it is acknowledged that some commentators characterize directors as agents and that "[s]ome corporation statutes treat directors as agents for specific purposes." Restatement (Third) of Agency § 1.01, Reporter's Notes, cmt. f(2).

The case cited by Defendants to support their assertion that a director cannot be an agent of the corporation, *Arnold v. Society for Savings Bancorp, Inc.*, also does not provide strong support for Defendants' argument that directors cannot be agents under Sarbanes-Oxley because that case was decided, in part, based on the legislature's intent with respect to a specific provision of the Delaware code. In *Arnold*, the court was considering whether a corporation could be held vicariously liable for the acts of its directors where the directors themselves were exempt from liability under a Delaware corporate code provision, Del. C. § 102(b)(7). 678 A.2d 533, 539–540 (Del.S.Ct.1996). The court found that it could not, relying in part on the Restatement (Second) of Agency, § 14 (C) (stating that "[n]either the board of directors nor an individual director of a business is, as such, an agent of the corporation or its members"). *Id.* The court stated that it would be "an analytic anomaly... to treat corporate directors as *agents* of the corporation when they are acting as fiduciaries of the stockholders in managing the business and affairs of the corporation." *Id.* (emphasis in original). However, another significant reason for reaching the conclusion that the directors could not be agents for the purposes of vicariously liability was that treating them as such would be inconsistent with the legislature's intent in enacting the Delaware provision giving rise to the exemption of the board members. In particular, the court found that imposing vicarious liability on the corporation on the basis that the directors were agents of the corporation could "lead to anomalous results" and "replicate the discredited notion

of awarding damages against the directors followed by indemnification of the directors by the corporation," a "result [that] was considered and rejected during the drafting of section 102(b)(7)." *Id.*

Because the Court finds that the meaning of the word "agent" in Sarbanes-Oxley is ambiguous, it looks to legislative intent. *Cleveland v. City of Los Angeles*, 420 F.3d 981, 990 (9th Cir.2005) ("[a]ccording to the rules of statutory construction, the court can only look to legislative intent when a statute is ambiguous"). Defendants point to the fact that Congress explicitly listed other categories of individuals who may be liable under Sarbanes-Oxley in Section 1514A(a), such as "officer[s]" and "employee[s]," but did not include directors in this list, arguing that this omission is an indication of Congress's intent *not* to impose individual liability on directors. The Court finds this argument unpersuasive.

█ Defendants' argument is based on the "frequently stated principle of statutory construction ... that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *Nat'l R. R. Passenger Corp. v. Nat'l Ass'n of R. R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). This principle, in turn, "reflects an ancient maxim—expressio unius est exclusio alterius." *Id.* Courts apply this rule with caution, however, because it is based on the (sometimes faulty) assumption that "all possible alternative or supplemental provisions were necessarily considered and rejected by the legislative draftsmen." *Nat'l Petroleum Refiners Ass'n v. F.T.C.*, 482 F.2d 672, 676 (D.C.Cir.1973); *Abdullah v. Am. Airlines, Inc.*, 969 F.Supp. 337, 348 (D.V.I.1997) ("the maxim should be employed with caution and in only limited circumstances"). Further, the Supreme Court has made clear that while this rule "may serve at times to aid in deciphering

legislative intent," it is "subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." *Sec. & Exch. Comm'n v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350–51 (1943), judgment entered sub nom. *Sec. & Exch. Comm'n v. C M Joiner Leasing Corp.*, 53 F.Supp. 714 (N.D.Tex.1944).

With these principles in mind, the Court concludes that Congress's failure to expressly include directors in the list of those who may be individually liable under Sarbanes-Oxley does not support the conclusion that it intended to shield directors who engage in retaliatory conduct from individual liability. As an initial matter, it is not clear that the drafters excluded directors from individual liability in the first place, given that Section 1514A(a) includes "agents"—a term that may or may not encompass directors, as discussed above. While it is true that the drafters imposed specific duties on "directors" in other provisions of Sarbanes-Oxley, Defendants have not pointed to any actual conflict that would arise from construing "agent" as including directors in Section 1514A(a). Further, there is no indication that the drafters "considered and rejected" an alternative version that specifically named directors as one of the categories of individuals who could be held individually liable. Most importantly, though, the Court finds that the context and general purpose of Sarbanes-Oxley support the conclusion that the term "agent" is intended to encompass directors.

As the Supreme Court recognized in *Lawson*, Congress enacted Sarbanes-Oxley in response to the Enron debacle. *See Lawson v. FMR LLC*, —— U.S. ——, 134 S.Ct. 1158, 1161, 188 L.Ed.2d 158 (2014) (citing S.Rep. No. 107-146, pp. 2-11 (2002)). A key feature of the proposed law that was highlighted by Senator Patrick Leahy was that it "protect[ed] corporate whistleblowers." 148 Cong. Rec. S6440 (daily ed. July 9, 2002). Senator Leahy illustrated the importance of this protection — and the "vulnerability of corporate whistleblowers to retaliation" — by pointing to the memorandum Enron outside counsel provided to Enron management when asked whether a "high-level employee of Enron" who had "reported improper accounting practices" could be terminated. *Id.* According to Leahy, the memo gave Enron management the "good news" that "Texas law does not currently protect corporate whistleblowers." *Id.* It is apparent from Senator Leahy's introduction that Congress intended to prevent a recurrence of such a scenario when it adopted the whistleblower protection contained in Sarbanes-Oxley. Yet that purpose would be significantly undermined were the Court to construe the term "agent" in Sarbanes-Oxley as excluding directors. Such an interpretation of Sarbanes-Oxley would permit a corporation's board members to fire high-level employees (like the whistleblower in the Enron case) for whistleblowing even though the exact same conduct on the part of a corporation's managers would give rise to individual liability.[6]

---

6. The Court also notes that in the context of employment discrimination, courts have generally rejected the argument that collective action by members of a committee or board shields the members of the group from individual liability, reasoning that such an approach would make it "all too easy for individuals with supervisory authority to avoid liability... simply by acting in concert." *See Heinemann v. Howe & Rusling*, 260 F.Supp.2d 592, 595 (W.D.N.Y.2003); *see also Bostwick v. Watertown Unified Sch. Dist.*, No. 13–C–1036, 2015 WL 520701, at *8 (E.D.Wis. Feb. 9, 2015) (school board members who voted in favor of discriminatory act could be held individually liable under 42 U.S.C.

The conclusion that Congress intended to impose individual liability on those who have the *functional* ability to retaliate against whistle blowers (whether as a board member or a manager) is also supported by the frequent references to the "employer" as the focus of the whistle-blower protections in Sarbanes-Oxley. *See, e.g.,* 148 Cong. Rec. S1785 (daily ed. Mar. 12, 2002) (statement by Senator Leahy in referring to Sarbanes-Oxley whistleblower protection language as necessary "to protect whistleblowers against retaliation by their employers"); S. 2010, 107th Cong. (as introduced on Mar. 12, 2002 and referred to the Judiciary Committee) (describing purpose of the bill as protection of "whistleblowers against retaliation by their employers...."); S. 2010, 107th Cong. § 6 (as reported out of the Judiciary Committee on May 6, 2002) (same); S. Rep. No. 107-146, at 13 (2002) ("If the employer does take illegal action in retaliation for lawful and protected conduct, subsection (b) allows the employee to file a complaint with the Department of Labor, to be governed by the same procedures and burdens of proof now applicable in the whistleblower law in the aviation industry"). As discussed below, Congress has given an expansive meaning to the term "employer" under some statutes, such as the FLSA, and thus, the use of this term in the legislative history is at least consistent with the conclusion that Congress intended to impose individual liability on board members who engage in retaliatory conduct against whistleblowers.

Finally, the Court disagrees with Defendants' characterization of the testimony of James R. Doty, former General Counsel of the Securities and Exchange Commission, before the Senate Judiciary Committee prior to the enactment of Sarbanes-Oxley. According to Defendant, Doty testified that "independence, as opposed to liability, was the appropriate tool for ensuring ethical governance by directors." Defendants' Supp. Brief at 3. In fact, Doty did not testify anywhere that measures to increase the independence of directors were preferable to the imposition of individual liability. He simply testified that *one* of the ways to prevent corporate abuse of investors was to enact measures that would increase the independence of directors. *Penalties for White Collar Crime: Hearing Before the Subcomm. on Crime and Drugs of the S. Committee on the Judiciary,* 107th Cong. 293 (2002) (Statement of James R. Doty) at 84. Indeed, Doty's testimony, read as a whole, suggests that he believed directors *should* face individual liability for retaliatory conduct. In particular, Doty emphasized in his testimony that a key feature of reforming corporate governance would be the "recognition that corporate accountability and responsibility starts with individual accountability." *Id.* He continued, "[j]ust as tone from the top communicates corporate values and creates corporate culture, *accountability starts as an individual matter from the top.*" *Id.* (emphasis added). Nothing in this statement suggests that board members who vote to terminate a high-level employee for whistleblowing should be excused from individual liability merely because they act in their capacity as directors of the corporation. Rather, this statement points to the opposite conclusion.

Therefore, the Court finds that while the language of Section 1514A(a) is ambiguous, the context and broad purpose of Sarbanes-Oxley support the conclusion that a director may be held individually liable as an "agent" under that provision.

ii. Timeliness of Sarbanes-Oxley Claim

█ Defendants contend Wadler's Sarbanes-Oxley claims against the individual

§ 1983 for violation of plaintiff's due process

rights). Similar logic appears to apply here.

defendants are untimely because he did not add these defendants to his administrative complaint until after the 180-day limitations period had expired and his claims against the individuals in the amended complaint do not relate back to the original complaint. *See* 18 U.S.C. § 1514A(b)(2)(D). Wadler, on the other hand, argues that his claims are timely as to all of the individual defendants because the original DOL Complaint was sufficient to exhaust his claims as to all of those defendants. The Court concludes that Wadler's claims in the original DOL Complaint were sufficient to exhaust his claims against Bio-Rad's CEO, Norman Schwartz, but not the remaining members of the Board of Directors and therefore, that the Sarbanes-Oxley claims against Defendants Louis Drapeau, Alice N. Schwartz, Albert Hillman and Deborah J. Neff are untimely.

■ There are no pleading requirements for whistleblower actions. *See* 29 C.F.R. § 1980. Indeed, a whistleblower complaint under Sarbanes-Oxley need not even be in writing but may be made orally, in which case it is reduced to writing by OSHA. 29 C.F.R. § 1980.103(b). Because of the absence of formal pleading requirements, complaints in OSHA administrative proceedings are not expected to meet the standards of pleading that apply to claims filed in federal court under Rule 12(b)(6). *In The Matter Of: Douglas Evans v. United States Environmental Protection Agency*, 2012 WL 3164358 (DOL Adm.Rev.Bd., July 31, 2012), at *6. Rather, a complaint is sufficient so long as the whistleblower complainants give an opposing party "'fair notice' of the charges against it." *Id.*; *see also Donovan v. Royal Logging Co.*, 645 F.2d 822, 826 (9th Cir.1981) ("It is settled that administrative pleadings are liberally construed and easily amended").

In *Evans*, the DOL held that "fair notice" requires only that an administrative complaint "provide (1) some facts about

the protected activity, showing some 'relatedness' to the laws and regulations of one of the statutes in our jurisdiction, (2) some facts about the adverse action, (3) a general assertion of causation and (4) a description of the relief that is sought." *Id.* This test does not, however, specifically address the question of what is required to give a particular individual "fair notice" where only the corporation is expressly named as a respondent in an OSHA administrative action.

Defendants cite a line of cases in which a handful of district courts outside of the Ninth Circuit have held that an individual defendant must be named in the "caption" of an administrative complaint to state a claim against that defendant. *See Robert Hanna v. WCI Comtys., Inc.*, 348 F.Supp.2d 1322, 1331 (S.D.Fla.2004) (finding claim against individual defendant had not been exhausted where the administrative complaint in OSHA proceeding under Sarbanes-Oxley referred to the individual's role in terminating him but did not include him as a "named defendant"); *Bozeman v. Per-Se Technologies, Inc.*, 456 F.Supp.2d 1282, 1358 (N.D.Ga.2006) (citing *Hanna* and holding that because the plaintiff had "failed to specifically name [the proper defendants] in the heading of his administrative complaint," the defendants were entitled to summary judgment for plaintiff's failure to exhaust his administrative remedies); *Smith v. Psychiatric Solutions, Inc.*, No. 3:08CV3/MCR/EMT, 2009 WL 903624, at *8 (N.D.Fla. Mar. 31, 2009) aff'd, 358 Fed.Appx. 76 (11th Cir.2009) (citing *Hanna* and *Bozeman* and finding that plaintiff had not exhausted administrative remedies as to certain defendants because they were not named in the caption or the body of the administrative complaint). The undersigned declines to follow this formalistic approach, which is based on the assumption that a complaint filed in an OSHA proceeding must meet the same

pleading requirements as a complaint that is filed in federal district court. As discussed above, it is not. To require that an individual defendant be named in the caption of an administrative complaint when no formal pleading (or even written document) is even required under Sarbanes-Oxley is inconsistent with the, statutory and regulatory framework established by Congress and the Department of Labor to ensure compliance with Sarbanes-Oxley.

Ninth Circuit cases addressing exhaustion requirements under Title VII further support the conclusion that an administrative complaint may, under some circumstances, be sufficient to exhaust a plaintiff's administrative remedies even where a particular defendant is not named as a defendant in any heading or caption. In *Chung v. Pomona Valley Community Hospital*, the Ninth Circuit addressed whether the plaintiff had exhausted his administrative remedies with respect to Title VII claims asserted against several doctors, where the administrative charge in the EEOC administrative proceeding had alleged only that the hospital where he worked had denied him promotions, without specifically naming the individual doctors. 667 F.2d 788, 789–90 (9th Cir.1982). The district court found that the claims asserted against the doctors failed because those individuals were not named in the EEOC charge. *Id.* at 790. The Court of Appeals, however, disagreed, finding that the district court's holding was based on an "overly-restrictive reading" of the EEOC charge. *Id.* The Court of Appeals found that because the doctors named as defendants "participated in promotion decision," they "should have anticipated that [the plaintiff] would name in his suit those who denied him the promotions mentioned in the charge." *Id.* at 790, 792. Therefore, the Court of Appeals held, the plaintiff's "charge supplied an adequate basis for his Title VII claims against the doctors" and the district court erred in dismissing those

claims. *Id.* at 792; *see also Sosa v. Hiraoka*, 920 F.2d 1451, 1459 (9th Cir.1990) (holding that there are three exceptions to exhaustion requirement under Title VII: "First, if the respondent named in the EEOC charge is a principal or agent of the unnamed party, or if they are "substantially identical parties," suit may proceed against the unnamed party.... Second, suit may proceed if the EEOC could have inferred that the unnamed party violated Title VII. Third, if the unnamed party had notice of the EEOC conciliation efforts and participated in the EEOC proceedings, then suit may proceed against the unnamed party").

Here, Wadler alleged in his original DOL Complaint that he was "terminated from [his] employment at Bio-Rad by the CEO." Inscoe Decl., Ex. A. Consequently, Defendant Norman Schwartz (Bio-Rad's CEO) received, within the 180-day limitations period, fair notice that he was being charged with retaliation and would likely be named as a defendant in any subsequent judicial proceeding. On the other hand, even under the liberal standard that applies to administrative complaints, the original DOL Complaint did not give the remaining Board members fair notice that they would be named as individual defendants in this action. Wadler does not cite any specific conduct on the part of these individuals that would have put them on notice that he was accusing them of retaliatory conduct; nor does he state that his termination was a result of a vote by the Board of Directors, even though he does not dispute that he was aware of the Board's vote soon after his termination. Finally, as discussed above, the question of whether directors may be held individually liable under Sarbanes-Oxley does not appear to have been squarely addressed in the case law, making it even less likely that these individuals would have anticipat-

ed that Wadler would assert claims against them under Sarbanes-Oxley.

Because Wadler did not give any Board members except Norman Schwartz fair notice in his original administrative complaint, and because the remaining Board members were not added to the administrative complaint until after the 180-day limitation period expired, the Court concludes that the Sarbanes-Oxley claims against all of the individual defendants except Norman Schwartz are untimely.

### b. Dodd-Frank

██ In contrast to Sarbanes-Oxley, which lists categories of individuals and entities who may be sued, Dodd-Frank permits whistleblowers to sue an "employer" for retaliation. 15 U.S.C.A. § 78u–6(h)(1)(A). The term "employer" is not defined in the statute, however, and again, there appears to be no case in which a court has squarely decided the question of whether individual directors may be sued under this provision. The one case cited by Wadler in which this question is addressed, *Azim v. Tortoise Capital Advisors, LLC*, lends only very weak support for Wadler's position. In that case, the plaintiff sought leave to amend her complaint to assert a claim under Dodd-Frank against certain individuals. *See* No. 13–2267–KHV, 2014 WL 707235, at *3 (D.Kan. Feb. 24, 2014). The court noted that the defendants had made a "statutory construction argument that Dodd-Frank does not pro-

vide for individual liability" but had been unable to cite any authority in support of their position; therefore the court concluded that amendment was "not futile given the state of existing law." *Id.* The court noted, however, that it might "ultimately adopt" the defendants' position on summary judgment. *Id.* The court did not address the specific statutory construction arguments made by the defendants in that case. *Id.*

Defendants assert that simply by using the word "employer," Congress made clear that directors may not be held individually liable under Dodd-Frank, citing an article by three practitioners who reach this conclusion based, in part, on the definition of "employer" found in Black's Law Dictionary. Defendants' Supp. Brief at 6–7 (citing *Individual Liability Unlikely Under Dodd-Frank Act's Whistleblower Anti-Retaliation Proscriptions*, Bloomberg BNA Securities Regulation & Law Report, July 6, 2015).[7] They also point out that under other federal statutes, including the ADA and Title VII, the term "employer" has been found to preclude individual liability altogether. The problem with Defendants' "plain meaning" argument is that courts that have found that Title VII and the ADA do not impose individual liability have not relied on any generally established definition of "employer," but rather, on specific provisions in those statutes limiting liability to employers with more than

---

7. In the BNA article, the authors write:
   [T]he [Dodd-Frank Act] applies only to "employers," a term left undefined. Under the plain meaning rule, "employer" should therefore be ascribed its commonly understood meaning: "[a] person, company, or organization for whom someone works; esp., one who controls and directs a worker under an express or implied contract of hire and who pays the worker's salary or wages." In the corporate context in which whistleblower cases traditionally arise, only the company is the employer—one's "boss"

   or "supervisor" is generally considered to be a co-employee working for the same employer. Thus, because the DFA's anti-retaliation provision expressly applies only to "employers" with no further elaboration, the analysis need go no further with respect to whether individuals may be held liable. Under the plain meaning rule, they may not.
   Bloomberg BNA Securities Regulation & Law Report, July 6, 2015 at 1348 (quoting Black's Law Dictionary (10th ed. 2014)).

15 employees. *See Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir.1993) (Title VII); *Walsh v. Nevada Dep't of Human Res.*, 471 F.3d 1033, 1038 (9th Cir.2006) (ADA).

In contrast, in the FLSA Congress defined the term "employer" much more broadly, to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C.A. § 203. The Ninth Circuit has held that "the definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' but 'is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes.'" *Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir.1999) (citing *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983)). Thus, the court explained, "[w]here an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer within the meaning of the Act, and is subject to liability." *Id.* at 1012.

Given that the term "employer" has been used in federal statutes in both a narrow sense (in the ADA and Title VII) and a broader sense (in the FLSA), and in the absence of any definition of the term in Dodd-Frank, the Court finds that the meaning of the word "employer" as used in Dodd-Frank is ambiguous. Again, the Court looks to legislative intent. Defendants make much of the fact that Dodd-Frank uses the term "employer" while Sarbanes-Oxley imposes liability on "any officer, employee, contractor, subcontractor, or agent" who retaliates against a whistleblower. There is nothing in the legislative history, however, that suggests that this difference was intended to eliminate individual liability for those who retaliated against whistleblowers. Indeed, as discussed above, the word "employer" ap-

pears repeatedly in the legislative history of Sarbanes-Oxley as a short-hand to describe those who could be sued under that statute, suggesting that the use of the term in Dodd-Frank does *not* reflect an intent to eliminate individual liability under Dodd-Frank.

This conclusion is also consistent with the legislative history of Dodd-Frank indicating that its purpose was to enact more stringent measures than were contained in Sarbanes-Oxley to protect whistleblowers. The Administration proposal that led to Dodd-Frank's enactment states that one of the goals of the reform was to "[s]trengthen [i]nvestor [p]rotection" by "expanding protections for whistleblowers [and] expanding sanctions available for enforcement...." U.S. Treasury Dept., Financial Regulatory Reform: A New Foundation, Rebuilding Financial Supervision and Regulation (June 27, 2009). Consistent with this purpose, all of the changes in Dodd-Frank relating to whistleblower protections that were discussed by Congress were aimed at increasing whistleblower protection. *See* S. Rep. No. 111-176, at p. 114 (2009) (amending § 1514A to clarify that "subsidiaries and affiliates of issuers may not retaliate against whistleblowers"—in addition to the issuers themselves); 156 Cong. Rec. S5873 (daily ed. July 15, 2010) (amending § 1514A "to extend whistleblower protections to employees of nationally recognized statistical rating organizations" such as Standard & Poor's and Moody's Investors Service). In this context, the suggestion that Congress, when it enacted Dodd-Frank, intended to exclude liability on the part of individuals who retaliate against whistleblowers—which had been a key feature of Sarbanes-Oxley aimed at increasing accountability at the top levels of corporations—is implausible. Had Congress intended to reduce whistleblower protection in this manner, one would at least expect to see some

mention of such a significant change. There appears to be no discussion of the change in the legislative history, however.

In short, the Court concludes that Congress intended that Dodd-Frank provide for individual liability that is at least as extensive as that of Sarbanes-Oxley, and therefore, that directors may be held individually liable for retaliating against whistleblowers under Dodd-Frank. Therefore, the Court rejects Defendants' assertion that the Dodd-Frank claim must be dismissed as to the individual defendants.

### 3. Whether Wadler Qualifies for Whistleblower Protection Under Dodd-Frank

Defendants ask the Court to decide an issue that has not been addressed by the Ninth Circuit, namely, the scope of protection from retaliation for whistleblowers under the Dodd-Frank Act. The Fifth Circuit and a minority of courts have concluded that Dodd-Frank's anti-retaliation provisions apply only to individuals who have provided information or assistance regarding possible violations of securities law to the SEC. The majority of courts, however, have found that the SEC's interpretation of the anti-retaliation provisions of Dodd-Frank, as set forth in Rule 21F-2(b)(1), is entitled to deference and therefore, that it should be interpreted as providing protection to internal whistleblowers as well. The undersigned finds that the reasoning of the majority of courts is persuasive and therefore concludes that Wadler's failure to provide information or assistance to the SEC does not defeat his claim under Dodd-Frank.

▆ In deciding whether to follow Rule 21F-2(b)(1), the Court looks to the framework set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, which explained that a court should take a two-step approach when it reviews an agency's construction of a statute that it administers. 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

In *Asadi*, the Fifth Circuit did not reach the second step of the *Chevron* inquiry because it concluded that Dodd-Frank's provisions are unambiguous. 720 F.3d at 625. In particular, it found that the plain language of § 78u–6(a)(6) unambiguously defines a whistleblower as an individual who provides information about possible illegal activities to the SEC, while § 78u–6(h)(1)(A) unambiguously describes three categories of protected activities. *Id.* While the protected activity includes activities that are required under any law, including Sarbanes-Oxley, the court found that this language did not create any conflict with the Dodd-Frank Act's definition of a "whistleblower." *Id.* at 626. The court reasoned that "[c]onflict would exist between these statutory provisions only if we read the three categories of protected activity as additional definitions of whistleblowers." *Id.* The *Asadi* court also found that "construing the Dodd-Frank whistleblower protection provision to extend beyond the statutory definition of 'whistleblowers' renders the [Sarbanes-Oxley] anti-retaliation provision, for practical purposes, moot." *Id.* at 629.

As Judge Koh found in *Connolly v. Remkes*, "a large majority of district courts before and after *Asadi* have taken a different position, finding ambiguity in the interplay between §§ 78u–6(a)(6) and 78u–

6(h)(1)(A)(iii)." 2014 WL 5473144, at *5 (N.D.Cal. Oct. 28, 2014) (citing *Murray v. UBS Securities, LLC*, No. 12 Civ. 5914 (JMF), 2013 WL 2190084 (S.D.N.Y. May 21, 2013); *Khazin v. TD Ameritrade Holding Corp.*, No. 13–4149, 2014 WL 940703, at *6 (D.N.J. Mar. 11, 2014); *Genberg v. Porter*, 935 F.Supp.2d 1094, 1106 (D.Colo. 2013); *Nollner v. S. Baptist Convention, Inc.*, 852 F.Supp.2d 986, 993 (M.D.Tenn. 2012); *Kramer v. Trans–Lux Corp.*, 3:11CV1424 SRU, 2012 WL 4444820, at *4–5 (D.Conn. Sept. 25, 2012); *Egan v. TradingScreen, Inc.*, 10 CIV. 8202 LBS, 2011 WL 1672066, at *5 (S.D.N.Y. May 4, 2011)).

In *Somers v. Digital Realty Trust, Inc.*, Judge Chen addressed in detail the reasons why Dodd-Frank is, in fact, ambiguous on this question. Judge Chen rejected the *Asadi* court's reliance on the plain language of the definitional term in Dodd-Frank, citing recent Supreme Court cases in which the Court recognized that "an express and clear definitional term in a statute may ultimately need to yield to countervailing interpretive factors in order to harmonize the meaning of the statute." *Somers*, 119 F.Supp.3d at 1099, 2015 WL 4483955 at *7 (citing *Bond v. United States*, ––– U.S. ––––, 134 S.Ct. 2077, 2019, 189 L.Ed.2d 1 (2014)). That is the case here, Judge Chen found, because "[a]s a number of courts have recognized, Section 21F(h)(1)(A)(iii) appears to be in direct conflict with the [Dodd-Frank Act's] definition of a whistleblower." *Id.* (internal quotations and citations omitted). The conflict arises "because subsection (iii) provides protection to persons who have not disclosed information to the SEC, while Section 21F(a)(6) requires the person report to the Commission." *Id.* (citations and internal quotations omitted). "Put differently, the majority of courts to consider the issue have found that subsection (iii) would be ineffective if whistleblowers must re-

port directly to the SEC." *Id.* (citing *Connolly*, 2014 WL 5473144, at *6).

Judge Chen went on to offer a number of very specific reasons in support of his conclusion that Dodd-Frank is ambiguous. First, he pointed to "a number of provisions in subsection (iii) that conflict with the assumption that only those who report to the SEC" are entitled to Dodd-Frank's whistleblower protections. *Id.* at 1101, 2015 WL 4483955 at *9. As one example, he cited the fact that subsection (iii) purports to make compliance with section 78j-1(b) of the Security Exchange Act of 1934 protected conduct, but that provision only permits auditors to report illegal conduct to the SEC *after* they have reported the illegal conduct internally and no action has been taken, indicating that "Congress wished to cover auditors who made required internal reports about illegal acts." *Id.* Similarly, he reasoned, subsection (iii) clearly covers internal reports by attorneys that are required under Sarbanes-Oxley, which does not permit attorneys to report violations to the SEC except under limited circumstances. *Id.*

Second, to the extent that applying Dodd-Frank to internal whistleblowers would "read the words 'to the Commission' out of the statutory definition," Judge Chen found this argument was not dispositive; were the court to find that the whistleblower protection of Dodd-Frank did not apply to internal whistleblowers, there would be surplusage in subsections (i) and (ii). *Id.* For example, subsection (i) prohibits retaliation against a whistleblower "in providing information to the Commission in accordance with this section" but that language would be entirely unnecessary if only those who provide information to the SEC can be whistleblowers under Dodd-Frank. *Id.* He noted that "the canon against superfluity assists only where a competing interpretation gives effect to ev-

ery clause and word of a statute." *Id.* (quoting *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 131 S.Ct. 2238, 2248, 180 L.Ed.2d 131 (2011)).

Third, Judge Chen examined the legislative history, noting that subsection (iii) was added at the last minute, suggesting that "Congress intended for the scope of the [Dodd-Frank] whistle-blower provisions to be broader than in earlier version of the bill." *Id.* at 1102–04, 2015 WL 4483955 at *10–11.

Fourth, he rejected the *Asadi* court's suggestion that an expansive reading of Dodd-Frank would render Sarbanes-Oxley moot, pointing out that some individuals may prefer the administrative forum that is available under Sarbanes-Oxley but not under Dodd-Frank, and also noting that certain kinds of non-economic damages (e.g. emotional distress) are available under Sarbanes-Oxley but not under Dodd-Frank. *Id.* at 1103–04, 2015 WL 4483955 at *11.

Finally, he found that policy reasons supported a finding of ambiguity, namely, the public policy of "encouraging reporting of securities violations." *Id.*

The undersigned agrees with the reasoning of Judge Chen, who like the majority of courts found that Dodd-Frank is ambiguous on the question of whether its anti-retaliation provisions apply to an individual who has provided information regarding possible illegal activity internally but has not provided such information to the SEC. Further, the Court finds that Judge Chen's reasoning has particular force in light of the Supreme Court's recent decision in *King v. Burwell*, — U.S. ——, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015). In that case, the Supreme Court cautioned against reading statutory language in isolation, explaining:

If the statutory language is plain, we must enforce it according to its terms. *Hardt v. Reliance Standard Life Ins.*

Co., 560 U.S. 242, 251, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010). But oftentimes the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." [*Food and Drug Admin. v.*] *Brown & Williamson* [*Tobacco Corp.*], 529 U.S. [120] at 132, 120 S.Ct. 1291 [146 L.Ed.2d 121 (2000)]. So when deciding whether the language is plain, we must read the words "in their context and with a view to their place in the overall statutory scheme." *Id.*, at 133, 120 S.Ct. 1291 (internal quotation marks omitted). Our duty, after all, is "to construe statutes, not isolated provisions." *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010) (internal quotation marks omitted).

135 S.Ct. at 2489. With this admonition in mind, the Court rejects *Asadi's* conclusion that the plain language of the "whistle-blower" definition in Dodd-Frank is controlling.

██ Having found that Dodd-Frank is ambiguous, the Court next addresses whether the SEC's interpretation of the statute, as stated in Rule 21F-2(b)(1) is entitled to deference on the basis that it is a "permissible construction of the statute." The Court finds that it is.

Once again, the Court looks to the reasoning in *Somers*, in which Judge Chen concluded that Rule 21F-2(b)(1) was entitled to deference under *Chevron*. 119 F.Supp.3d at 1095–97, 2015 WL 4483955, at *5. In *Somers*, the court noted that every court that has reached step two of the *Chevron* analysis has found that Rule 21F-2(b)(1) is a "permissible construction" of Dodd-Frank. *Id.* (citing *Connolly*, 2014 WL 5473144, at *6; *Khazin*, 2014 WL 940703, at * 6; *Murray*, 2013 WL 2190084, at *5). He went on to offer four reasons for

finding the SEC's interpretation to be reasonable.

First, the court in *Somers* found the SEC's rule to be reasonable because it resolves the tension between the narrow definition of a whistleblower and "seemingly very broad coverage of subsection (iii)." *Id.* at 1105, 2015 WL 4483955, at *12. "Put simply, the SEC's interpretation is reasonable because it permits a large class of individuals to qualify as protected whistleblowers, a result which appears consistent with the broad language Congress employed in subsection (iii)." *Id.*

Second, Judge Chen found that "the SEC's interpretation is reasonable because it 'comports with Dodd-Frank's scheme to incentivize broader reporting of illegal activities.'" *Id.* (quoting *Connolly*, 2014 WL 5473144, at *6).

Third, Judge Chen found that "the SEC's interpretation is reasonable because it encourages internal reporting of possible law violations." *Id.* at 1105, 2015 WL 4483955, at *12. In support of this conclusion, Judge Chen cited the SEC's amicus brief in that case, in which the SEC argued that establishing a two-tiered structure of anti-retaliation protections ... might discourage some individuals from reporting internally in appropriate circumstances, ... thus jeopardizing the benefits that can result from internal reporting." *Id.* The Court notes that the SEC makes the same argument here. *See* SEC Amicus Brief at 9-13.

Fourth, Judge Chen found that the SEC's interpretation of Dodd-Frank was reasonable because "a narrow reading of Dodd-Frank would 'significantly weaken the deterrence effect on employers who might otherwise consider taking an adverse employment action.'" *Id.* at 1106, 2015 WL 4483955, at *13 (quoting SEC Amicus Brief at 29). Again, the SEC makes the same argument in this case. *See* SEC Amicus Brief at 30.

For the reasons expressed by Judge Chen in *Somers*, the undersigned finds that Rule 21F-2(b)(1) is entitled to deference under *Chevron*. Further, because Rule 21F-2(b)(1) provides that internal whistleblowers are protected from retaliation under Dodd-Frank, the Court rejects Defendants' assertion that Wadler's Dodd-Frank Act claim fails as a matter of law because he did not provide any information or assistance to the SEC.

**C. Defendants' Challenge to California Labor Code Section 1102.5 Claim**

■ California Labor Code section 1102.5, like Dodd-Frank and Sarbanes-Oxley, seeks to protect whistleblowers by prohibiting employers from retaliating against employees for engaging in certain categories of protected activity. Cal. Lab. Code § 1102.5. The subsection upon which Wadler relies, subsection (c), prohibits employers from retaliating against employees "for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation" *Id.* § 1102.5(c). Defendants contend Wadler fails to state a claim because he has not alleged facts showing that he "refused to participate in a cover-up of allegedly unlawful activity." Motion at 11. The Court disagrees.

Defendants cite a single case in support of their position, *Banko v. Apple*, 20 F.Supp.3d 749 (N.D.Cal.2013). In that case, Judge Seeborg found that the plaintiff's allegations were sufficient to state a claim under section 1102.5 where they supported an inference that the plaintiff refused to participate in a cover-up of his supervisee's embezzlement. 20 F.Supp.3d 749, 759–60. The Court concludes that Plaintiff's allegations in this case also support such an inference. While Defendants attempt to distinguish the facts in *Banko*, citing allegations that the defendants spe-

cifically instructed the plaintiff to ignore the illegal conduct in that case, *see id.* at 752–53; the court did not hold that such specific instructions are a requirement for stating a claim under section 1102.5 Nor does the Court find any authority that supports such a stringent pleading requirement. At this early stage of the case, Plaintiff's claim under section 1102.5 is sufficiently pled.

## IV. CONCLUSION

For the reasons stated above, the Motion is GRANTED as to Plaintiff's First Claim, under Sarbanes-Oxley, to the extent it is asserted against Defendants Louis Drapeau, Alice N. Schwartz, Albert J. Hillman and Deborah J. Neff. As to those Defendants (but not as to Defendant Bio-Rad or its CEO, Norman Schwartz), the Sarbanes-Oxley claim is dismissed with prejudice. In all other respects, the Motion is DENIED.

**IT IS SO ORDERED.**